**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Morgan Grenfell & Co., Limited, The Bank of Tokyo Limited, The Governor and Company of the Bank of Scotland and Orion Royal Bank Limited, Plaintiffs,**

v.

**REPUBLIC OF PALAU, Defendant.**

**No. 86 Civ. 0590 (RWS).**

United States District Court,
S.D. New York.

Dec. 9, 1988.

Jones, Day, Reavis & Pogue, New York City (Robert Layton, Barry R. Satine, of counsel), Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Robert B. Wallace, of counsel), for plaintiffs.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (Wayne A. Cross, Stephen J. Riegel, Stephen P. Falvey, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Republic of Palau ("Palau") has moved under Rules 59(e) and 62(b), Fed.R.Civ.P., for this court to reconsider the opinion filed on August 8, 1988 in favor of the plaintiffs Morgan Guaranty Trust Company of New York, Morgan Grenfell & Co., Limited, The Bank of Tokyo Limited, The Governor and Company of the Bank of Scotland, and Orion Royal Bank, Limited (the "Banks") ("Opinion"), to vacate the judgment entered in this case on August 12, 1988 and enter judgment dismissing the complaint against it, and further to stay the execution or any proceedings to enforce the judgment pending the disposition of this motion. Alternatively, Palau has

sought under Rule 62(d), Fed.R.Civ.P., to stay the execution of the judgment or any proceedings to enforce the judgment pending the disposition of any appeal without requiring a supersedeas bond.

The motions were heard on September 16, 1988 and considered fully submitted on September 20, 1988.[1] For the reasons stated below, the motion to reconsider will be granted, the motion to set aside the judgment will be denied, and the motion to stay the enforcement of the judgment pending appeal without the filing of a supersedeas bond will be denied in part.

Here presented is yet another move in the intricate pattern of the relationship between Palau, an impecunious archipelago, and the Banks, the financiers of a power plant and tank farm (the "Project") that now provides electricity for the islands. Palau has the Project and the electricity, the loans for the Project's construction are unpaid and in default, and the Banks at long last have a judgment for the amount of the loans in the neighborhood of $48 million entered on August 12, 1988. The issues between the Banks and Palau have been presented to Congress and this court and are moving toward appellate review. To resolve the equities between the Banks and Palau as they exist today against the complicated pattern of the past remains a daunting task, despite the assistance of skilled counsel.

### The Motion to Reconsider

Given the difficulty of the issues of sovereign immunity and fraud in connection with a complex financing between commercial banks and a barely emerging nation, reconsideration of the Opinion is appropriate, although there is no new evidence or authority relied upon except as noted with respect to President Remeliik's recently recovered letter of February 7, 1984. Familiarity with the Opinion is assumed. 693 F.Supp. 1479.

1. Palau submitted as newly discovered evidence the letter of February 7, 1984 from President Remeliik to the Inspector General, United States Department of the Interior ("DOI"). The mysteries of document retention and production in

### The Waiver of Sovereign Immunity

■ Palau now contends that RPPL 1–20 (the "National Government Private Borrowing Authority Act") relied upon in the Opinion did not specifically authorize Palau's President to waive Palau's sovereign immunity, that there is no "proof in the record of any interpretation or legislative intent that RPPL 1–20 confers such authority," that RPPL 1–54 was the only legislation that authorized Palau to enter into the loan agreements, and that the High Commission suspended RPPL 1–54 in this regard. However, RPPL 1–20 in fact authorized the President to enter into the loan agreements. The statute declared:

(3) The need to develop necessary government services and programs requires immediate outlays of funds not currently available to the national government.

(5) The current international political status of the Republic of Palau makes borrowing from other sovereign nations and international financial organizations an uncertainty.

(6) There currently exists the possibility of the national government borrowing funds from private financial institutions and persons at reasonable rates and under reasonable terms, provided that sufficient enabling legislation is enacted to enable the Republic to meet those conditions normal to such private borrowings.

(RPPL 1–20 § 1(b)).

With that stated public purpose, the Palauan Congress concluded that:

(7) Congress may properly delegate to the President a portion of its powers and duties with regard to borrowing funds, and Congress may set the guidelines under which such delegation of power is executed.

(RPPL 1–20 § 1(b)).

To effectuate this public policy, the Palauan Congress gave the President of Palau full authority:

Palau remain unresolved, and, although the requirements of Rule 59(b) appear not to have been met, the letter will be admitted in evidence as Defendant Exhibit DA and considered in connection with this motion.

To borrow money or goods and incur long term obligations and repay the same with interest, from any private person; backed by the full faith and credit of the Republic.

(RPPL 1–20 § 3(a)).

Pursuant to the authority of RPPL 1–20, President Remeliik agreed to the terms of the Recourse Agreement in which he pledged Palau's full faith and credit and waived its sovereign immunity to comply with the repayment provisions of the Guarantees to the Banks which are "private persons."

Palau now claims the President was without power to waive Palau's sovereign immunity because the specific language "the President may waive the sovereign immunity of Palau" does not appear in RPPL 1–20. This does not, however, address the broad authority granted the President "by and through the Republic" to:

... make any other agreement or contract that may be necessary, reasonable and proper for the execution of a private borrowing agreement....

(RPPL 1–20 § 3(1)).

On the other hand, the Palauan Congress enacted RPPL 1–54 at the ECGD's insistence to enable Palau to deal with government to government transactions (Opinion at p. 40). Not surprisingly, the ECGD, as the only government entity involved in the loan transaction other than Palau, was interested in drafting such legislation. The Guarantors did not participate in this exercise, and RPPL 1–54 did not affect the President's exercise of his powers in the Banks' favor under RPPL 1–20.

RPPL 1–54 specifically extends to governmental entities while RPPL 1–20 specifically limits the President's authority to borrowing from private entities.

Finally, the Recourse Agreement Palau signed provided that the parties intended that "the waiver of sovereign immunity ... [is] made in conformity and shall be governed by the Foreign Sovereign Immunities Act of 1976 of the United States of America" (Opinion at p. 40). The Recourse Agreement also provided that the loan in question constituted "private and commer-

cial acts for private and commercial purpose." As such, the commercial activity of Palau constituted a waiver under the Foreign Sovereign Immunities Act of 1976 (Opinion at p. 41).

As is apparent from the foregoing considerations, the language of the relevant legislation has been relied upon rather than the contemporaneous opinions of either the Attorney General of Palau or George Hudson ("Hudson"), the chief negotiator for the Banks. In addition to the normal rules of statutory construction, see *Metropolitan Transp. Auth. v. F.E.R.C.*, 796 F.2d 584, 591 (2d Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987), the record contains sufficient evidence to challenge the adequacy of the opinions of either gentlemen on the difficult questions of law on which they opined.

### The Reliance Upon Misrepresentation

Although the Banks were found in the Opinion to have misrepresented by omission, Palau's claim failed because it did not rely upon that misrepresentation. The usual difficulty of determining the responsibility for decision making by any government entity was even more extreme here. The representatives of Palau negotiating with the Banks were in London, listening with sympathetic ears to the representations by the Project's promoter made to counter the political opposition at home. However, the final decision was made in Palau by the President who knew that others, particularly the DOI, considered the representations as to the revenue producing capacity of the Project to be false. It is the evidence for that proposition that Palau now attacks.

The Opinion stated that:

[t]he DOI Inspector General advised Remeliik not to consummate the loan agreements ... because, among other things, a DOI review of revenue projections and Palau's other available revenue sources had caused DOI to conclude that Palau could not service the debt.

(Opinion p. 22)

This finding is bottomed on the language contained in Inspector General Mulberry's

letter to President Remeliik on July 14, 1983, describing the telex of June 6, 1983, which, of course, is among the missing. Mr. Mulberry described his conclusion as follows:

> Moreover, based on a review of revenue expectations from the power plant and fuel storage facility, and the Government's available revenue sources, we concluded that the Government would be unable to meet payment demands specified under the proposed loan agreements.
>
> \* \* \* \* \* . \*
>
> In our telegram of June 6, 1983, we advised you of our conclusion. . . .

According to Palau, no evidence exists to support the conclusion that the June 6th telegram referred to the possibility that the project would be self-financing from its revenues. The issue turns upon the adequacy of the July 14, 1983 letter to permit the inference.

The Inspector General uses the word "conclusion" in that letter only in connection with of Palau's inability to repay loans from project revenues. Further, President Remeliik's letter of September 2, 1983 is even more revealing and confirms the accuracy of the Inspector General's description of his telex. In the President's letter he describes the circumstances leading up to the signing of the loan document on June 8, 1983 and his basis for not responding to the Inspector General's telex of June 6, 1983. President Remeliik sets forth the efforts on May 18, 1983 of Vice President Oiterong, Ambassador Lazarus Salii, and Minister Willter to obtain the Note Verbale from U.S. Ambassador Fred M. Zeder and Secretary of the DOI. President Remeliik even included the text of the Note Verbale for the Inspector General's information. President Remeliik stated in his letter:

> Given the foregoing scenario and especially in light of full support and endorsement from both Ambassador Zeder and Secretary Sanjuan, I elected not to relay your June 6th message to Vice–President Oiterong in London.

(Exhibit 109).

In so doing, President Remeliik, the responsible executive, made a conscious decision. He had before him, at most, the IPSECO projections, the Ibedul's challenge, and the Banks' silence assuming that it had been communicated to him or that it formed an integral part of the delegation's determination. He was confronted with the Inspector General's conclusion that, based upon the IPSECO projections and Palau's financial resources, Palau would be unable to meet the payment obligations under the loans and with the Inspector General's recommendation that Palau should not execute the loan documents (Exhibit 75). President Remeliik, "especially in light of [the] full support and endorsement" from the signatories of the Note Verbale, which contained, *inter alia,* the U.S. commitment that millions in unencumbered aid could be used to repay the loans, decided to permit his Vice President to go forward with the loan agreements. Whatever can be said of his decision, it certainly was not predicated upon his faith in the IPSECO projections or the Banks' silence at the May 9, 1983 meeting, which he did not attend.

The Palauan administration of its files has been erratic, perhaps understandably in view of the assassination of its President and the intensity of the political rivalries that have played upon the issues presented here. The absence of the June 6 telegram and the President's testimony made the task of factual reconstruction difficult. The additional evidence, the President's letter of February 7, 1984, does not alter the findings previously reached. The letter adopts what was said in the September 2 letter (". . . my letter of September 2, 1983 fairly sets out the reasons why the Republic disagrees . . ."; "I conclude as I did in my September 2, 1983 letter . . .") and supplements the earlier letter ("To supplement those comments . . .").

Palau argues that this new document evidences that it was more reasonable for the Palauans to rely upon the Banks' alleged implicit confirmation of IPSECO's projections than upon the Inspector General's recommendations. However, the earlier September 2, 1983 letter states what President Remeliik in fact relied upon,

namely, the Note Verbale and the pledge of Compact funds. The February 4 letter does not alter the previous statement.

Reliance thus remains the missing element in Palau's claim.

### The Stay of Judgment and the Supersedeas Bond

■ In deciding whether to order a stay of judgment pending appeal, a court must consider (1) whether the petitioner is likely to prevail on the merits of his appeal, (2) whether, without a stay, the petitioner will be irreparably injured, (3) whether issuance of a stay will substantially harm other parties interested in the proceedings, and (4) wherein lies the public interest. *McSurely v. McClellan*, 697 F.2d 309, 317 (D.C.Cir. 1982), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985) (citing *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)). Each of these requirements must, of course, be applied flexibly according to the unique circumstances of each case. Thus, for example, where the latter three factors strongly favor interim relief, the court has required only that the petitioner demonstrate a "substantial case on the merits," even if ultimate success is not a mathematical probability. *Washington Metropolitan Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

■ Upon ordering a stay of judgment pending appeal, it is common for the court to require the appellant to post a supersedeas bond in the full amount of the judgment. A supersedeas bond serves three main purposes: first, it permits the appellant to appeal without risking satisfying the judgment prior to appeal and then being unable to obtain a refund from the appellee after the judgment is reversed on appeal; second, it protects the appellee against the risk that the appellant could satisfy the judgment prior to the appeal but is unable to satisfy the judgment after appeal; and third, it provides a guarantee that the appellee can recover from the appellant the damages caused by the delay incident to the appeal, that is, the bond guarantees that the appellee can recover the interest that accrues on the judgment during appeal, guarantees that the appellant will satisfy the judgment plus interest and costs if it is affirmed on appeal. *See United States v. Mansion House Center Redev. Co.*, 682 F.Supp. 446, 449 n. 5 (E.D. Mo.1988); *see also Poplar Grove Planting and Refing Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190–91 (5th Cir.1979).

■ Despite these advantages, however, the Second Circuit has recognized that "an inflexible requirement for impressment of a lien and denial of a stay of execution unless a supersedeas bond in the full amount of the judgment is posted can in some circumstances be irrational, unnecessary, and self-defeating, amounting to a confiscation of the judgment debtor's property without due process." *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1154 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Accordingly, the district court has discretion to grant a stay of judgment with no supersedeas bond or with only a partial supersedeas bond if doing so does not unduly endanger the judgment creditor's interest in ultimate recovery. *See id.* at 1155; *see, e.g., Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871 (10th Cir.1986) ($500,000 malpractice insurance proceeds placed in escrow and restrictions on transfer of assets to secure $2.1 million judgment); *Trans World Airlines, Inc. v. Hughes*, 314 F.Supp. 94 (S.D.N.Y.1970) ($75 million bond to secure a judgment of $145,448,140); *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F.Supp. 501 (E.D.Pa.1973) ($100,-000 bond, stock placed in escrow, and restrictions imposed on financial commitments to secure $1.2 million judgment).

■ The equities in this case support a stay of judgment upon the posting of a partial supersedeas bond in the amount of all the interest payments due since default.

First, because of the difficulties of the issues here presented, it would be foolhardy to predict that there is no likelihood of success on appeal. By definition, of course, the effort has been made to achieve a result that is just and supported by the

authorities and that therefore will be supported upon review. To conclude otherwise would require the judgment to be set aside. However, as Judge Leventhal wrote in *Washington Metropolitan Transit Commission v. Holiday Tours, Inc.,* "[T]ribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo be maintained." 559 F.2d 841, 844–45 (D.C. Cir.1977).

Second, immediate enforcement of a $45 million judgment would impact Palau severely, even in terms of obtaining a supersedeas bond to cover the judgment. According to Palau's First National Development Plan, the anticipated revenue for Palau in 1988 is about $31 million, while anticipated budgetary expenditures by the government are approximately $28.5 million. This situation is not unlike the one the court faced in *Henry v. First National Bank of Clarksdale,* 424 F.Supp. 633 (N.D. Miss.1976), *aff'd,* 595 F.2d 291 (5th Cir. 1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), in which the NAACP and others sought to appeal a state antitrust judgment and to stay enforcement of that judgment without posting a supersedeas bond. In granting the stay of judgment and waiving the requirement of a supersedeas bond, the court observed:

> While the record reflects that plaintiff NAACP can obtain funds to finance the procurement of a supersedeas bond, to accomplish this NAACP will be required to borrow a substantial portion of the amount of the bond and to deplete funds necessary to conduct its normal operations. To repay these sizeable loans the NAACP will have to curtail practically all of its usual functions during the pendency of the appeal, shown to be a period of two or three years. Many current projects will have to be terminated and new projects cannot be commenced.

424 F.Supp. at 638–39.

Third, there is no showing that the Banks' ability to recover any ultimate judgment from Palau and its accruing interest will be any greater now than in the future. Indeed, Palau will be more able to satisfy the judgment and accruing interest when the Compact of Free Association becomes effective. Furthermore, Palau is an archipelago in the far western corner of the north Pacific Ocean—it is not going anywhere.

Finally, the balance of the public interest of Palau predominates over the financial interest of the Banks, even granted the size of the judgment entered. Also relevant is Congress's intent when it enacted Section 104(e) of the Joint Resolution approving the Compact of Free Association to prevent the Banks from attaching United States funds granted to Palau to satisfy their claims in this litigation. This is not the only instance where the remedies of commercial banks have been deferred to accommodate the needs of an emerging nation.

*Conclusion*

For the reasons set forth above, the motion to reconsider has been granted, the motion to set aside the judgment denied, and the motion to stay the enforcement of the judgment granted upon the filing of a supersedeas bond in the amount of all the interest payments due since default. Settle order on notice.

It is so ordered.