**LAZARD FRERES & CO., Plaintiff–Counter–Defendant–Appellee,**

v.

**PROTECTIVE LIFE INSURANCE COMPANY, Defendant–Counter–Claimant–Appellant.**

No. 616, Docket 96–7664.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1996.

Decided March 26, 1997.

J. Douglas Richards, O'Sullivan Graev & Karabell, New York City (Andrew D. Manitsky, of counsel), for Defendant–Counter–Claimant–Appellant.

Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Steven C. Herzog, of counsel), for Plaintiff–Counter–Defendant–Appellee.

Before: VAN GRAAFEILAND, JACOBS and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

This breach of contract action between two large and sophisticated bank debt traders involves the attempted sale of several million dollars worth of bank debt. Because it concluded, as a matter of law, that the defendant could not show fraud in the inducement or failure of a condition precedent, the district court granted the plaintiff's summary judgment motion. The district court's decision ultimately turns on two factual issues addressed only implicitly by the court: 1) the date on which the contract was formed; and 2) whether the defendant retained the right to perform a diligent review of the relevant documents up to the date of closing. We believe that facts material to each of these questions remain in genuine dispute, and we therefore vacate and remand. We note, however, that if on remand the defendant fails to convince the fact finder as to either of these

factual issues, the plaintiff must prevail as a matter of law.

## BACKGROUND

Plaintiff Lazard Freres & Co. ("Lazard") is an investment bank and registered broker-dealer. Defendant Protective Life Insurance Co. ("Protective") is "one of the biggest, most successful bank debt players in the marketplace."[1] Its subsidiary, Protective Asset Management Corp. ("PAMCO"), handles a bank debt portfolio valued at $760 million.

On the morning of January 28, 1994, Lazard agreed to purchase $10 million (face value) of bank debt issued by Maxwell Communications Corp. (the "MCC bank debt"). Lazard attempted to turn around and sell the debt immediately. Kevin Murphy, a Lazard sales representative, called a number of his customers to try to interest them in the purchase. One of the customers he called was Mark Okada, a principal of PAMCO. Murphy left an "urgent" message at Okada's office in California for Okada to call him back. At the time, Okada was in Disney World, attending a high yield bond conference. When he received the message, Okada called Murphy from a pay phone.

The telephone conversation between Murphy, Okada, and Michael Weinstock, a Lazard analyst, lasted approximately eleven minutes. During that conversation, Murphy described the MCC bank debt to Okada and explained to him that if Protective wanted to purchase the debt, it had to act fast, indeed that very day, as a letter to MCC's creditors (the "Scheme Report") describing the debt was in transit to the market and would become public very soon. According to Protective, Murphy represented that he had knowledge of the contents of the Scheme Report, and that it would verify, among other things, that twenty percent of the face amount of the debt was going to be paid in March 1994, and that there were no outstanding litigations against MCC that would reduce the value of the debt.[2] If Protective were to act right away—before the Scheme Report became

known in the market—Murphy allegedly told Okada, Protective could purchase the debt at an excellent price.

Okada did not immediately commit to buying the debt. Instead, he consulted with his boss, James Dondero, who was with him at the conference in Disney World. Dondero allegedly gave Okada the go-ahead to make the purchase, so long as he received oral representation from Lazard that "the 20 cents of the 41 cents we were paying [was] escrowed, bullet-proof, coming to us in March." Okada called Murphy back, and—according to Protective—orally agreed to purchase the bank debt at 41 1/2 cents on the dollar.

Lazard prepared a final written contract (the "Written Confirmation") that afternoon, dated it January 28, 1994, and immediately sent it to Protective to be signed. Four days later, Lazard sent a copy of the Scheme Report by overnight mail, and that document was duly received by Protective on February 2. On February 8, Protective signed the Written Confirmation. Although the Scheme Report was in Protective's possession for the six days prior to its signing of the Written Confirmation, and although Protective claimed to be relying on Lazard's characterization of what was contained in that Report, Protective failed to read the Report before signing the Written Confirmation.

Both the oral and written agreements had been "conditioned upon the preparation, review and execution of documentation acceptable to Lazard and Protective" prior to closing, as was the custom for these deals. In late February 1994, Okada, in the course of going over the closing documents, finally read the Scheme Report. He immediately became convinced that Lazard had misrepresented its contents. Apparently, the Scheme Report did not guarantee, as Lazard had supposedly alleged, that twenty percent of the debt would be paid in March and that there were no significant outstanding litiga-

---

1. The Joint Appendix in this case has been filed under seal. All references in this opinion to its contents are to information also contained in the unsealed briefs.

2. Lazard vigorously denies that these statements were made, but for the purposes of summary judgment, we must assume that they were.

tions against MCC that could reduce the value of the debt.

Believing that it had been misled, Protective refused to negotiate the final closing documentation needed to complete the purchase of the bank debt. In March 1994, the price of the MCC bank debt dropped substantially. Unable to close its deal with the recalcitrant Protective, Lazard was forced to sell the debt to another purchaser at a much lower price.

Lazard brought suit in the New York State Supreme Court in April 1994, alleging breach of contract on the part of Protective and seeking $538,210.53 in damages to cover its loss. Protective removed the action to the federal district court. In its response, Protective asserted two affirmative defenses: 1) fraud in the inducement (and justifiable reliance thereon); and 2) failure of a condition precedent (the finalization of closing documents). Protective conceded that the failure to finalize the closing was due to its own refusal to negotiate, but it argued that this was wholly justified by Lazard's misrepresentations and by a provision in the contract that Protective alleges gave it the right to void the deal upon review of the Scheme Report up to the time of closing.

On May 3, 1996, the district court granted Lazard's motion for summary judgment. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, No. 94 Civ. 3959, 1996 WL 223975 (S.D.N.Y. May 3, 1996). Noting that the parties disagreed as to whether New York, California, or Alabama law should be used to determine Protective's defense of justifiable reliance, Judge Knapp chose not to decide that question. Instead, he concluded that even under Alabama law, which both parties conceded was most favorable to Protective, Protective, as a sophisticated and major player in the bank debt market, was not justified in relying on Lazard's characterization of the contents of the Scheme Report. Since it had the Report in its possession, Protective was duty bound to read it before signing the Confirmation. As to Protective's condition precedent argument, Judge Knapp held that

> a person who refuses to read a document that has been in its possession for six days can[not], as a matter or law, justifiably

contend that it was defrauded by misrepresentations as to the contents thereof. Therefore, Protective failed as a matter of law to negotiate in good faith, and such conduct excused the failure of the condition precedent.

*Id.* at *3. The district court did not address Protective's claim that it had the right under the contract to void the agreement, upon review of the Scheme Report, at any time prior to closing.

This appeal followed.

## DISCUSSION

We review a grant of summary judgment *de novo*, drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party. *See, e.g., Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Gummo*, 75 F.3d at 107. The party seeking summary judgment bears the burden of demonstrating the absence of any genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

*I. The date on which Protective became bound to purchase the MCC bank debt from Lazard*

The district court's opinion was premised on the assumption that the purchase of the MCC bank debt did not occur until Protective signed the Written Confirmation. At that point, said Judge Knapp, Protective was not justified in relying on Lazard's representations concerning the contents of the Scheme Report, since Protective had, for six full days, been in possession of that Report without reading it. On appeal, Protective

challenges that underlying assumption. It argues that, subject to its retained right to "the preparation, review and execution of documentation" prior to closing, it was contractually bound to purchase the debt as a result of Okada's and Murphy's oral agreement in their second telephone conversation on January 28, 1994. Protective therefore claims that the reasonableness of its reliance on Lazard's misrepresentations should be measured as of January 28, not February 8, 1994. Protective argues:

> Since Protective made its commitment to purchase the [MCC bank] debt on January 28, 1994, and since those on both sides of the transaction regarded the subsequent written confirmation as a mere confirmation of the earlier oral agreement, the District Court erred, and improperly gave the benefit of strained inferences to the movant on summary judgment, by viewing Protective's mere signature to the written confirmation of a pre-existing commitment as a necessary occasion for Protective to revisit its prior decision.... When properly analyzed in the context of the oral commitment made on January 28, 1994, Protective's reliance upon Lazard is justifiable even under New York law.

Protective provides ample evidence to support its theory. Witnesses for both sides testified that Okada stated, "We're done," upon reaching agreement on January 28, and that that statement meant: "I own that—I own that bank debt at 41 and a half." Protective alleges that "we're done" is the statement customarily understood in the bank debt community to indicate that a contract has been reached. Indeed, John V. Doyle, the head of Lazard's high yield bond sales group, testified:

> There is a basic tenet on Wall Street and in the markets that goes something along the lines of my word is my bond. What that means is that when someone enters into a transaction, they are bound to see it through to closure. In securities, bonds, stocks, et cetera, my word is my bond happens when one side of the trade says to the other, okay, you're done.

More importantly, the Written Confirmation itself is dated January 28, 1994, and

states not that Lazard wishes to enter into a contract, but rather that Lazard "wishes to confirm our agreement." Lazard itself conceded below that "Okada committed to purchase the MCC bank debt" on January 28, 1994. In addition, an internal memorandum prepared by Murphy apparently sometime in March 1994 indicates that Murphy attempted to reach Okada while he was out of town in order to "consummate" a trade before the Scheme Report became public the following Monday. Finally, Okada testified:

> Our business practice is that on the—on January 28th when I talked to Kevin [Murphy] and ... Michael Weinstock that we had already committed to purchase the [MCC] bank debt based on the representations that they had made on the phone so our deal was already consummated as of then....
>
> If you're asking me whether we take a commitment letter seriously, we do, but we also take verbal commitments seriously also, and this was simply a written confirmation of that verbal commitment.

Lazard responds by noting that the Written Confirmation states that Protective "indicate[s] ... acceptance and agreement to the terms contained *herein*" (emphasis added), which implies that the terms of the Written Confirmation constitute the legally binding agreement. In addition, Lazard points out that Protective itself, in its pleadings, averred that Okada signed the Written Confirmation on February 8 "[i]n justifiable reliance" upon Lazard's misrepresentations, which implies that Protective did not consider itself bound until that point. Lazard alleges that Protective only switched to its theory that it was bound as of January 28 when it realized that it had negligently failed to read the Scheme Report before signing the Written Agreement. Finally, Lazard offers a policy argument:

> Protective cites no authority whatsoever for the proposition that this Court should disregard the parties' February 8 written agreement in favor of a supposed previous oral understanding, and we are aware of none. The practical consequences of such a ruling, moreover, would be disastrous. Parties to business transactions would be

discouraged from conducting due diligence before signing written agreements, in the hope that they could later argue that they were misled into entering such agreements. Such a ruling also would reward grossly negligent conduct like that of Protective here, involving an admitted failure by seasoned investment professionals to read a supposedly critical document underlying a multi-million-dollar investment before signing a written contract binding their company to purchase that investment.

Lazard's response does not satisfy us that there is no genuine factual issue as to the date at which Protective became bound. As for Lazard's emphasis on the word "herein" in the Written Confirmation, that word seems no more convincing than the language that Protective quotes: Lazard "wishes to confirm our agreement." And, in any event,

> [i]n a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning.... If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment.

*Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (citations and internal quotation marks omitted); *see also Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 350 N.Y.S.2d 895, 897, 305 N.E.2d 907, 909 (1973).

Nor are we convinced by the part of Protective's initial pleadings relied upon by Lazard. To the extent that the pleadings may suggest that Okada believed that he was bound only upon signing the Written Confirmation on February 8, they are substantially contradicted by Okada's unambiguous deposition testimony, quoted above. Under the circumstances, this part of Protective's answer should not be taken as a concession that there is no issue of fact on the point.

Finally, Lazard's policy argument is misplaced. The question is not whether due diligence ought to be favored. Even Protec-

tive acknowledges its importance. The question is rather the time when due diligence was expected to take place, and the time when the agreement became binding subject to that due diligence. Was Protective expected to check the documents (including the Scheme Report) before binding itself to purchase the debt by signing the Written Confirmation, or was the signing of the Written Confirmation merely a ministerial act to acknowledge the previously binding oral agreement, under which Protective had the right to perform some due diligence (by reviewing the documentation) at any time prior to the formal closing? This is precisely the question of fact that Protective disputes, and Lazard has failed to provide any evidence that would establish that a jury could not rationally agree with Protective's characterization of the parties' intent. *See Ronan Assocs., Inc. v. Local 94–94A–94B, Int'l Union of Operating Eng'rs.,* 24 F.3d 447, 449 (2d Cir.1994) ("Under traditional principles of contract law, questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact...."); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968) ("[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event."); *Jardella v. Welin Davit & Boat Corp.,* 219 A.D. 353, 220 N.Y.S. 115, 120 (N.Y.App.Div.1927) ("It is a common experience in ordinary business life that parties come to an oral agreement, and that subsequently, one or both of the parties write confirmatory letters. In such cases it is considered that the oral agreement constitutes the real contract between the parties, and that the letters are to be treated merely as evidence of what had previously been orally agreed upon...."); *Stites v. Yelverton,* 60 N.M. 190, 289 P.2d 628, 630 (1955) ("Parties to an oral, informal agreement may or may not become bound prior to the execution of a contemplated formal writing, depending upon their intention to be or not to be so bound. What is intended is a question of fact depending upon the circumstances of the case."); *Peoples Drug Stores, Inc. v. Fenton*

*Realty Corp.*, 191 Md. 489, 62 A.2d 273, 275 (1948) ("The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely a[s] evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case.").

■ It may be that in the bank debt market a party is not bound by an oral commitment, and the operative moment is instead the signing of a written confirmation. It may also be that if a party enters into an oral agreement before performing due diligence, it is commonly understood that that party retains the right to perform due diligence before signing a written confirmation, but not later still (*i.e.* prior to signing the closing

documents).[3] But at summary judgment we cannot say that either of these is the case. The burden of establishing the absence of a genuine issue of material fact rested on Lazard, as the moving party, and it is clear that on these points it has not met its burden. As such, we must proceed under the assumption that Protective was bound to purchase the MCC bank debt on January 28, 1994, subject only to document review before closing. Thus, the grant of summary judgment can only be affirmed if, under the applicable state law, Protective's reliance as of that date was unjustifiable as a matter of law.[4]

## II. Choice of law

■ A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York. *See*

---

3. The question of whether Protective retained the right to perform due diligence by reviewing the Scheme Report prior to closing is further discussed in Part IV, *infra*.

4. Lazard argued for the first time at oral argument that Protective could not have been bound by any oral agreement on January 28, 1994, because such an agreement would have been unenforceable under the statute of frauds. The thrust of this argument is that Protective could not have been bound, and could not legitimately have believed itself to be bound, since the oral agreement was unenforceable at law until Protective signed the Written Confirmation. It may be that this is a valid argument. It is not, however, an argument that we can accept at this point.

The applicability of the statute of frauds is complex and often fact dependent. As a result, we cannot say with certainty that Lazard would have been unable to enforce the alleged oral agreement had Protective refused to sign the Written Confirmation. For one thing, the contract would have been enforceable up to $5,000. *See Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 431 (2d Cir.1995). Moreover, Lazard may well have been able to discover an internal document of Protective's acknowledging the oral agreement, and thus satisfying the statute. *See* E. ALLEN FARNSWORTH, CONTRACTS § 6.7, at 426–27 (2d ed. 1990) (noting that the statute can be satisfied by, among other things, a receipt, an invoice, or corporate minutes, even if those documents were not directed to the other party). Or Protective might have acknowledged the contract in court or to third parties. *Cf. Rail Europe, Inc. v. Rail Pass Express, Inc.*, No. 94 Civ. 1506, 1996 WL 157503, at *4 (S.D.N.Y. Apr. 3, 1996) ("Since defendant has admitted to the existence of an agreement between the parties, the Statute of Frauds does not bar enforcement of that agree-

ment."). Or Lazard may have been able to show that, in reliance on Protective's promise, it completed the purchase of the MCC bank debt and ceased its attempts to sell the debt other brokers. *See* RESTATEMENT (SECOND) OF CONTRACTS § 139 (1979) ("A promise which the promisor should reasonably expect to induce action ... on the part of the promisee ... and which does induce the action ... is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only be enforcement of the promise."); *Onbank & Trust Co. v. James P. Burr Enters. Inc.*, 652 N.Y.S.2d 802, 804 (N.Y.App.Div.1997). In light of all of these possibilities, and of the fact that Lazard failed to raise this issue until oral argument on appeal, so that Protective was unable to establish a factual basis for these or other possibilities, we will not assume that the statute of frauds would have barred Lazard's enforcement of the oral agreement had Protective not signed the Written Confirmation. *Cf.* FARNSWORTH, *supra*, § 6.10, at 446 ("[I]t is generally agreed that the statute [of frauds] cannot be raised for the first time on appeal."); *Telecommunications Tech. Corp. v. Deutsche Bank AG*, 652 N.Y.S.2d 291, 291–92 (N.Y.App.Div.1997) (same). While that is not technically what Lazard has done here (it has not raised the statute as a substantive defense to a breach of contract claim), many of the reasons behind the rule are persuasive in this situation as well.

Lazard remains free to raise the statute of frauds on remand. Given the hypothetical nature of the inquiry, it is unlikely that Lazard will be able to establish conclusively that it could not have enforced the oral agreement had Protective refused to sign the Written Confirmation. Still, Lazard may be able to use the statute of frauds as an indication of the parties' intent not to be bound by the oral agreement.

*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). This court has recently explained the New York choice of law rule in breach of contract cases:

> Until the latter part of this century, New York courts employed a "traditional, 'territorially oriented' approach to choice-of-law issues which applied the law of the geographical place where one key event occurred, such as the place of the wrong in tort cases or where an agreement was entered into or performed in contract cases." *Istim, Inc. v. Chemical Bank,* 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 798, 581 N.E.2d 1042, 1044 (1991). More recently, however, New York courts, recognizing that "[a] State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair," abandoned these rigid rules in favor of a more flexible approach. *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 70–71, 595 N.Y.S.2d 919, 921, 612 N.E.2d 277, 279 (1993). Under this more flexible approach, New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute. *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283–84 (1963).

> In contract cases, New York courts now apply a "center of gravity" or "grouping of contacts" approach. *Id.* Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. · *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936, 940 (1993). New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Id.* at 226, 597 N.Y.S.2d at 907, 613 N.E.2d at 939. The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. *Id.*

*Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030–31 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997).[5]

▪ Applying this test, the district court concluded

> that New York law applies to Lazard's claim for breach of contract. The contract at issue was drafted in New York, negotiated in New York and Florida, and executed in New York and California. Under

---

**5.** To complicate the matter somewhat, courts often appear to be confused as to whether New York courts apply the same choice of law rules to tort claims and contract claims.

In New York, "the relevant analytical approach to choice of law in tort actions" is the "interest analysis." *Schultz v. Boy Scouts,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). That is, "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Id.* Many courts, including at one point our own, have considered this test to be interchangeable with the "grouping of contacts" test used in contract cases. *See, e.g., Hormel Int'l Corp. v. Arthur Andersen & Co.,* 55 A.D.2d 905, 390 N.Y.S.2d 457, 458 (N.Y.App.Div. 1977) ("With respect to both contracts and torts, the 'center of gravity', or 'grouping of contacts', theory now governs the choice of law, and the applicable law is the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.") (citation and internal quotation

marks omitted); *Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131, 137 (2d Cir. 1991) ("Choice of law issues involving contractual disputes are resolved in New York by an interest analysis, and therefore the law of the jurisdiction having the greatest interest in the litigation controls.") (citations and internal quotation marks omitted); *Anglo American Ins. Group v. CalFed, Inc.,* 940 F.Supp. 554, 557 (S.D.N.Y.1996) ("In New York, the 'interest analysis' test governs choice of law issues involving contract [and] tort...."). It now seems clear, however, that the conflation of the two tests is improper. The New York Court of Appeals has emphasized that the "interest analysis" used in torts is distinct from the "center of gravity" or "grouping of contacts" test used in contract. *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612–14, 642 N.E.2d 1065, 1068–70 (1994); *Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 906–07, 613 N.E.2d 936, 938–39 (1993); *see also Robins v. Max Mara, U.S.A., Inc.,* 923 F.Supp. 460, 465 (S.D.N.Y.1996) ("New York has differ-

New York conflicts rules, the center of gravity of the MCC transaction was New York, not California or Florida. Alabama and Tennessee had absolutely no contact with this contract, except for being the principal place of business and the place of incorporation, respectively, of Protective. *Lazard Freres*, 1996 WL 223975 at *2.[6] The district court's reasoning, however, treats the contract as being the Written Confirmation. If instead we assume, as we must (*see supra* Part I), that the relevant agreement is the oral one allegedly reached on January 28, 1994, then the fact the contract was "drafted" in New York drops out of the analysis. Nevertheless, it remains clear that New York law should control. The only other state at play on January 28 was Florida, and Florida's sole connection to the case was purely "arbitrary": Okada and Dondero happened to be attending a conference there.[7]

While it seems certain that New York law governs Lazard's breach of contract claim, it is less clear whose law should govern Protective's affirmative defense of fraud in the inducement—or, to put the question even more precisely, whose law should govern the specific element of that affirmative defense at issue here: the question of whether Protective's reliance on Lazard's misrepresentations was justifiable.

Protective argues vehemently that "[w]ith respect to the central question of fraud that is at issue in this case, tort principles must govern," and hence that New York's *tort conflicts* principles should be applied to determine which state's *substantive tort law* should govern. But the cases Protective cites for this proposition hardly dictate that result. *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y.1989), is a case in which the plaintiffs sued for the tort of fraud-

ulent inducement. The district court rightly concluded that the choice of law provision in the contract between the parties should not control, because, under New York law, a contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort. *See id.* at 1150; *accord Klock v. Lehman Bros. Kuhn Loeb, Inc.*, 584 F.Supp. 210, 215 (S.D.N.Y.1984). In the instant case, instead, there is no contractual choice of law provision at issue. And the cause of action sounds in *contract*, not in tort. It is only the affirmative defense of fraudulent inducement that resembles an issue of tort.

It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort claims and the contract claims in a given suit. *See, e.g., Chapelle v. Beacon Comm. Corp.*, No. 92 Civ. 8987, 1993 WL 465312 at *2 (S.D.N.Y. Nov.12, 1993), *appeal dismissed*, 84 F.3d 652 (2d Cir.1996). And the New York Court of Appeals has held that "there is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction." *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 751, 191 N.E.2d 279, 285 (1963). Here, however, there is only a contract claim, with an affirmative defense that sounds in tort. And there is no authority for the proposition that New York courts would apply the law of one jurisdiction to a breach of contract claim and the law of another jurisdiction to an affirmative defense to that claim. Nor is there authority suggesting that New York courts would apply contract choice of law principles to determine the applicable law governing a breach of contract claim and tort choice of law principles to determine the applicable

---

ent choice of law tests for tort and contract claims.").

**6.** Lazard is a general partnership with its principal place of business in New York. California enters the picture because PAMCO, the bank debt division of Protective of which Okada is a principal, is located in California.

**7.** Protective notes that traditionally, New York courts applied the law of the place where the contract was "made"—*i.e.* the place where the second signature was affixed—*see, e.g., Max Fac-*

*tor & Co. v. Janel Sales Corp.*, 298 F.2d 511, 512 (2d Cir.1962) (per curiam) ("[T]he contract was not 'made' in New York but, rather, where the second signature was affixed."), and argues that, since traditional choice of law factors such as this one are given the heaviest weight in the analysis, *see Brink's*, 93 F.3d at 1031, California law should apply. But New York has rejected this slavish adherence to the traditional factors. And in any event, if we assume that the contract was made orally on January 28, then the place where the second signature was affixed on February 8 is irrelevant.

law governing an affirmative defense to that claim.

In fact, the relevant authorities cut the other way. Thus, in *Stephens v. American Home Assurance Co.*, 811 F.Supp. 937 (S.D.N.Y.1993), *vacated and remanded on other grounds sub nom. Stephens v. National Distillers and Chem. Corp.*, 70 F.3d 10 (2d Cir.1995), the court wrote:

> [T]he defense of fraud in the inducement and the equitable rescission of a contract due to fraud are declarations that the contract was void *ab initio. Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir.1992); *Eastern Dist. Piece Dye Works, Inc. v. Travelers Ins. Co.*, 234 N.Y. 441, 138 N.E. 401 (1923). The validity of a contract must be determined by reference to the laws of the state that has the most significant relationship with and greatest interest in its formation, rather than the state in which its enforcement is sought. If there were no valid contracts in the first place, the Liquidator could hardly attempt to enforce them.... [S]ince New York has the greatest interest in a determination of the validity of the contracts, New York conflict of laws rules dictate that New York substantive law applies [to the affirmative defense of fraud in the inducement].

*Id.* at 946–47; *see also Morgan Guar. Trust Co. v. Republic of Palau*, 693 F.Supp. 1479, 1495 (S.D.N.Y.1988) (remarking in *dicta* that "[n]o authority has been cited for applying different laws to a cause of action and the affirmative defenses to that cause of action"), *on reconsideration*, 702 F.Supp. 60 (S.D.N.Y. 1988); *cf.* Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 618 N.Y.S.2d 609, 614, 642 N.E.2d 1065, 1070 (1994) (applying contracts choice of law rules: "Although Shearson urges that tort cases provide the proper analytical framework for resolving conflicts over 'tort-like issues' of

punishment and deterrence, what is involved here is an insurance policy—a contract.").

Accordingly, we conclude that, under New York's conflict of law rules, New York law controls the entirety of this breach of contract claim, including the affirmative defense of fraud in the inducement and the justifiable reliance element of that defense.[8]

### III. Protective's reliance on Lazard's alleged misrepresentations

 Under New York law, in order to sustain a claim of fraud, a party must establish, *inter alia*, justifiable reliance. *See, e.g., Gouldsbury v. Dan's Supreme Supermarket, Inc.*, 154 A.D.2d 509, 546 N.Y.S.2d 379, 381 (N.Y.App.Div.1989); *New York State Mortgage Loan Enforcement & Admin. Corp. v. Coney Island Site Five Houses, Inc.*, 109 A.D.2d 311, 491 N.Y.S.2d 671, 676 (N.Y.App. Div.1985), *appeal dismissed*, 67 N.Y.2d 1049, 504 N.Y.S.2d 1024, 495 N.E.2d 357 (1986). It is well established that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984). Lazard relies heavily on this and similar cases. (*See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 156–57 (2d Cir.1995); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123–24 (2d Cir.1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282–83 (2d Cir. 1975); *First Fin. Fed. Savings & Loan Ass'n v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685, 687 (8th Cir.1987) (applying New York law); *Congress Fin. Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 470–72 (S.D.N.Y.1992)). But there are significant problems with Lazard's reliance on these cases.

---

8. We note in passing that Protective, which disagrees with this holding, is the party that removed the case to the federal courts. Neither it, nor Lazard, has asked us to certify the choice of law question to the New York Court of Appeals. And we also note that it is likely—even if the affirmative defense of fraudulent inducement (or

the justifiable reliance element thereof) were treated by New York as subject to tort choice of law rules—that New York in applying those rules would conclude that New York law governs. Certainly the "interest analysis" would lean that way.

First, in many of these cases, there was a contractual provision expressly disclaiming reliance on any oral representations. *See Banque Arabe,* 57 F.3d at 156; *First Financial,* 834 F.2d at 687; *Grumman,* 748 F.2d at 732. These cases were therefore decided under the principle set out in *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 600–04, 157 N.E.2d 597, 598–600 (1959), that where a party specifically disclaims reliance upon a representation in a contract, it cannot later assert that it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon. No such contractual disclaimer is present in the instant case.

■ Second, a number of these cases involved issues of nondisclosure, rather than affirmative misrepresentation. *See Banque Arabe,* 57 F.3d at 156; *Aaron Ferer,* 731 F.2d at 123; *Frigitemp,* 524 F.2d at 282–83; *Congress Fin. Corp.,* 790 F.Supp. at 470–72. Since "[f]raud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment, are different causes of action and demand different elements of proof under New York law," *Congress Fin. Corp.,* 790 F.Supp. at 469, those cases are of limited importance here.

Finally, and most importantly, *all* of these cases involved situations in which the relevant facts were easily accessible to the relying party. Thus, the principle embodied in these precedents is that "[w]here the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable." *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989); *see also Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411, 419–20 (S.D.N.Y.

1992) ("In this case, there is no basis to dispute that [plaintiff] had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, [it] would have been able to discover the alleged misrepresentations."); *Most v. Monti,* 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (N.Y.App.Div.1982) ("It is clear that [the] information ... was readily available to plaintiffs upon their making reasonable inquiry."); *Marine Midland Bank v. Palm Beach Moorings, Inc.,* 61 A.D.2d 927, 403 N.Y.S.2d 15, 17 (N.Y.App.Div.1978) (the claimant "had the opportunity to examine the corporate records before assuming the obligations").

■ But in the instant case—proceeding as we must on summary judgment on the assumption that Protective was bound by the oral agreement of January 28, 1994—the Scheme Report was not in Protective's possession at the time that it committed to the deal. Protective did not, therefore, have access to the relevant information. "When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980); *see also Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 470 N.Y.S.2d 431, 432–33 (N.Y.App.Div.1984) (plaintiff may have been justified in relying on defendant's misrepresentations because he had no way of knowing that the land he purchased had in fact not been used as a horse farm, but rather as an industrial waste dump); *Todd v. Pearl Woods, Inc.,* 20 A.D.2d 911, 248 N.Y.S.2d 975, 977 (N.Y.App.Div.1964) (even where plaintiff could have discovered the facts by inspecting public records, the court still considered the facts to be peculiarly within the defendant's knowledge such that plaintiff's reliance was justifiable), *aff'd,* 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861 (N.Y. 1965).[9]

---

9. In *Grumman,* this court distinguished *Mallis* and *Tahini* in broad terms: "Unlike the case before us, in *Mallis* and *Tahini,* the allegedly undisclosed information was only known by— and indeed only available to—the defendants, and incapable of discovery by the plaintiff, no

matter how diligent its investigation." *Grumman,* 748 F.2d at 738 (footnote omitted). In light of *Todd,* however, this statement cannot be viewed as establishing that, under New York law, the information had to be available only to the defendant and absolutely unknowable by the

Lazard allegedly told Protective that it had to act fast to consummate the deal before the Scheme Report became generally available, or else it would lose its opportunity to make a profit. Murphy admits that he told Okada that Lazard knew the situation concerning the MCC bank debt as well as, or better than, anyone else. Okada was dealing from a pay phone in Disney World, and was forced to rely on Murphy's representations or lose his chance to capitalize on the opportunity. According to Protective—whose evidence we take as valid at summary judgment—Lazard set the whole deal up in such a way that Protective had to rely on Lazard's representations and had to commit itself to purchase the MCC bank debt before it had the opportunity to examine the Scheme Report. It would therefore appear that Protective might have been justified in relying on Lazard's alleged misrepresentations when it orally committed itself to purchase the MCC bank debt on January 28, 1994.[10]

■ This conclusion, nevertheless, seems to us to be too simple. As a substantial and sophisticated player in the bank debt market, Protective was under a further duty to protect itself from misrepresentation. It could easily have done so by insisting on an examination of the Scheme Report as a condition of closing. *See Rodas v. Manitaras,* 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (N.Y.App. Div.1990).

> [W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documenta-

tion *or inserting appropriate language in the agreement for his protection,* he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

*Id.* (emphasis added).[11] We believe that the failure to insert such language into the contract—by itself—renders reliance on the misrepresentation unreasonable as a matter of law. *See Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.,* 183 A.D.2d 742, 583 N.Y.S.2d 478, 479 (N.Y.App.Div.1992).

This, however, does not resolve the case. For Protective does, in effect, claim that it inserted just such appropriate language into the agreement. That claim is intimately connected with Protective's alternate theory on appeal: that, due to the failure of the condition precedent, Lazard cannot seek enforcement of the contract.

## IV. Failure of the condition precedent

■ Protective's second affirmative defense is failure of the condition precedent. At the time of the January 28 oral agreement, the parties agreed, consistent with the general practice in the bank debt market, that their deal was "subject to documentation." Likewise, the Written Confirmation expressly noted that it was "conditioned upon the preparation, review and execution of doc-

---

plaintiff before reliance can be deemed justified. *See Mallis,* 615 F.2d at 80 ("[I]ndeed some cases have imposed liability in situations in which plaintiff could have determined the truth with relatively modest investigation.").

**10.** If, on the other hand, Lazard is able to establish on remand that the contract was not formed until Protective signed the Written Confirmation on February 8, 1994, then, as the district court found, Protective's reliance was not justified, and Lazard will be entitled to judgment as a matter of law.

**11.** *Rodas* was a case in which the contract contained an express disclaimer of reliance clause, thus bringing it under the rule of *Danann. See Rodas,* 552 N.Y.S.2d at 619–20. While its prece-

dential value in this case would therefore appear suspect, the principle for which it is here cited has been reaffirmed in a case that did not involve a contractual disclaimer of reliance. *See Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.,* 183 A.D.2d 742, 583 N.Y.S.2d 478, 479 (N.Y.App. Div.1992). It is true that the references to the duty to secure protective contractual language in both *Rodas* and *Curran* are *dicta* insofar as in each of those cases the information was not peculiarly within the defendant's knowledge. We nonetheless find this *dicta* indicative of the law of New York, *see also Shepherd v. Whispering Pines, Inc.,* 188 A.D.2d 786, 591 N.Y.S.2d 246, 249 (N.Y.App.Div.1992), and note that neither party has sought certification on this issue.

umentation acceptable to Lazard and Protective." [12]

According to Protective, Okada believed that the fact that the contract was conditioned upon review of documentation meant that he could review the Scheme Report in the course of preparing and reviewing the closing documentation and, if unsatisfied with its contents, could void the agreement. In other words, Protective argues that in the January 28 agreement it retained the right to perform some due diligence by examining documents (including the Scheme Report) at any time prior to closing, and that its signing of the Written Confirmation in no way altered this fact. This is, of course, what Protective attempted to do. When Okada got around to reading the Scheme Report while reviewing the final documentation, he discovered Lazard's alleged misrepresentations and refused to negotiate further.

It is thus Protective's contention that it did secure the necessary contractual provision protecting it from Lazard's misrepresentations; it did this by retaining the right to back out of the contract upon independent review of the document that contained the facts that were peculiarly within Lazard's knowledge. Although Protective thereby claims what amounts to a month-long option to purchase a volatile security at a fixed price, this contention cannot be rejected summarily on this record, which contains very little uncontested information about the practice of the industry, the parties' course of conduct, or the financial consequences of the parties' contentions. For this argument ultimately to succeed at trial, the fact finder must be convinced that the Scheme Report was included within the "documentation" that

Protective was permitted to review before closing. It must also be convinced that the examination that was contemplated could occur after the signing of the Written Confirmation. Both of these may be hard to prove. They are not, however, out of the question, and so at summary judgment we must assume them unless Lazard can point to uncontroverted evidence to the contrary.

Lazard responds by noting that the Written Confirmation provides that the deal is conditioned upon the "preparation" and "execution" of documentation, and therefore obviously refers only to documents to be drawn up by the parties, not documents already in existence. But the Written Confirmation actually refers to "preparation, *review* and execution of documentation" (emphasis added), which might imply that the word "documentation" embraces documents other than those to be drawn up by the parties. And the Scheme Report, though it had been forwarded previously, was also included among the closing documents forwarded later by Lazard to Protective. Moreover, to the extent that the Written Confirmation is ambiguous, it should be construed against the drafter— in this case, Lazard. *See, e.g., Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir.1987) (per curiam) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party.") Under the circumstances, and at this stage in the proceedings, we cannot say that the Written Confirmation establishes that the Scheme Report was not one of the documents meant to be approved before closing. *Cf. Sayers,* 7

---

**12.** One aspect of Protective's condition precedent argument is easily disposed of. Protective argues that, since this closing documentation was never prepared, the condition precedent to the final binding contract was never met. Of course it would be ridiculous to suggest that a party can agree to a contract, decide not to bother to negotiate the closing documentation, and then defend in a breach of contract suit on condition precedent grounds. *See, e.g., Teachers Ins. & Annuity Ass'n v. Butler,* 626 F.Supp. 1229, 1234– 36 (S.D.N.Y.1986) (refusal to negotiate closing documentation is a breach of an implicit good faith obligation to do so), *appeal dismissed,* 816 F.2d 670 (2d Cir.1987). But Protective's argu-

ment is somewhat different. It claims that its failure to negotiate was justified by the fact that it had learned of Lazard's fraud in the inducement. Protective suggests that, even if its reliance was unjustifiable as a matter of law, such that it could not establish fraud, it still was justified in failing to negotiate in good faith, since Lazard had behaved in bad faith in making the initial misrepresentations. But allowing this claim would undermine the legal principle that a party cannot avoid the effects of a contract on fraud grounds unless its reliance was justifiable. Protective's argument on this score is an impermissible attempt to do an end run around the elements of a New York claim of fraud.

F.3d at 1094 (summary judgment is inappropriate in a contract dispute when the meaning of the contract is ambiguous).

In any event, the Written Confirmation is only relevant insofar as it sheds light on the oral contract it allegedly confirmed: the agreement of January 28, 1994. Accordingly, what matters is the parties' understanding of the phrase "subject to documentation" as they used it on January 28. This phrase cannot be taken unambiguously to exclude the Scheme Report. The record is replete with testimony by Okada that he understood "documentation" to include the Scheme Report. And there is no statement in the record to the contrary from any of Lazard's witnesses.[13]

We cannot, therefore, say as a matter of law that the agreement did not allow Protective the right to void the contract upon review of the Scheme Report at any time before execution of the final closing documents. We cannot conclude, that is, that Protective failed to act reasonably or to undertake due diligence, since it may have retained the right, up to the closing, to determine whether Lazard had accurately represented the Scheme Report's contents.

It is possible to read the contract a) as having been made on January 28, 1994, b) as requiring a purely ministerial signing of a Written Confirmation, and c) as being, nonetheless, subject to voiding at any time before the closing on diligent examination of documents, including the Scheme Report. If the contract did date from January 28 and did give Protective this right of review, and if Lazard did misrepresent the contents of the Scheme Report, then Protective's refusal to close the deal was justified and Lazard may not recover for breach of contract.

By casting this argument as a separate defense, Protective implies that if it convinces the finder of fact that it retained the right to review the Scheme Report prior to closing, it should prevail regardless of the date at which it became bound. We disagree. The Written Confirmation is ambiguous only to the extent that it is being used to indicate the parties' intent on January 28, when the earlier oral agreement was reached. If, instead, there were no binding oral contract, we would find the Written Confirmation unambiguous as a matter of law. In the absence of specific contractual language, we do not see how a sophisticated party, claiming to rely on the other party's representations of the contents of a critical document, can assert that it had the right to review that document at any time prior to closing even though it had possession of the key document for nearly a week before making the contract.

## CONCLUSION

Applying New York law, which we hold governs this dispute, we find that there exist genuine issues of material fact as to 1) the date at which the parties entered into the contract, and 2) whether Protective had the right under the contract to refuse to close the deal upon review of the Scheme Report. We therefore vacate the district court's grant of summary judgment and remand the case for further proceedings. It should be noted that if the finder of fact determines that the operative date of the contract was February 8, 1994, or, regardless of the date at which Protective became bound, if the finder of fact concludes that Protective did not have the right to void the deal upon review of the Scheme Report after having signed the Written Confirmation, then Lazard must prevail as a matter of law. On the other hand, if Protective is able to establish that it was bound by the January 28, 1994, oral agreement, subject to a right to review the Scheme Report prior to closing, and that Lazard materially misrepresented the contents of the Scheme Report in convincing Protective to purchase the MCC bank debt, then Lazard will not be able to recover for breach of contract.

---

13. Lazard again seems to claim that anyone familiar with the bank debt market would understand that this was not the case. But Lazard has provided no testimony to that effect, and its claim is contradicted by the testimony of Protective's principals, who are themselves major players in the bank debt market.