## In re CRYSTAL APPAREL, INC., et al., Debtors.

### Bankruptcy Nos. 94–B–40318 (PCB) through 94–B–40329 (PCB).

United States Bankruptcy Court, S.D. New York.

March 26, 1998.

---

Constangy, Brooks & Smith, L.L.C. by R. Carl Cannon, Atlanta, GA, for Crystal Brands, Inc.

Weil, Gotshal & Manges by Alan B. Miller, New York City, for the Reorganized debtor.

Judith Greenspan, New York City, for Amalgamated Cotton, Garment and Allied Industries Fund.

### Memorandum Decision Disallowing Claim No. 134 (Amalgamated Cotton Garment and Allied Industries Fund) .

PRUDENCE CARTER BEATTY, Bankruptcy Judge.[*]

The Reorganized Debtor has objected to Claim No. 134 (the "Claim") filed by the Amalgamated Cotton Garment and Allied Industries Fund (the "Fund") which seeks $689,291.78 for an alleged withdrawal liability obligation of one of the debtors. The Fund opposes the disallowance of the Claim. The Reorganized Debtor has moved for summary judgment in this contested matter.

For the reasons set forth below, the court finds that there are no material facts in issue and grants the Reorganized Debtor's motion for summary judgment and disallows Claim No. 134.

### STATEMENT OF UNDISPUTED FACTS [1]

1. On January 21, 1994 (the "Petition Date"), Crystal Apparel, Inc. and its sub-

---

[*] Formerly known as Prudence Beatty Abram.

[1] The Statement of Undisputed Facts is based on the Joint Local Rule 7056–1 Statement submitted

sidiaries and affiliates (collectively the "Debtors"), including Eaglewear, Inc. ("Eaglewear"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Shortly thereafter the court ordered that the cases be consolidated for procedural purposes only and jointly administered.

2. The Debtors ultimately proposed a liquidating plan of reorganization after selling their operating entities during the course of the case. The plan was confirmed on July 25, 1995. As part of the plan, the Debtor's estates were substantively consolidated and the Debtors became the Reorganized Debtor. The Debtors' unsecured creditors are expected to receive less than 50 cents on the dollar.

3. The Fund filed the Claim as a general unsecured claim on April 18, 1994. The Claim is predicated on the facts which follow.

4. On June 16, 1993 the Fund issued to Eaglewear two notices of assessment of withdrawal liability[2] in the amount of $689,291.78 based on the closing of four Eaglewear facilities. The Eaglewear facility in Mahanoy City, Pennsylvania ("Mahanoy") ceased operations on June 12, 1991. Eaglewear's operations at its Gallitzen, Pennsylvania facility ("Gallitzen") ceased on October 16, 1992. Earlier Eaglewear had ceased its operations at two other locations.

5. On September 14, 1993, counsel for Eaglewear timely mailed a request for review of the Fund's withdrawal liability assessment.

6. On September 27, 1993 the Fund responded to Eaglewear's request for review

and denied the request. It is the position of the Fund that the Fund may impose withdrawal liability on Eaglewear pursuant certain agreements executed by Eaglewear as of March 1, 1990 which are more fully described in the findings which follow.

7. The Fund, which was created in 1946, exists pursuant to an "Agreement and Declaration of Trust" (the "Trust Agreement") which has been amended from time to time over the years. The Fund is actually two funds governed by a single trust agreement. There is a Retirement Fund and a Social Insurance Fund.[3] The Fund is mainly supported by contributions made by employers (the "Employers")[4] pursuant to collective bargaining agreements and supplements thereto which the Employers have entered into with various locals of the Amalgamated Clothing and Textile Workers Union (the "Union").

8. The Trust Agreement provides that there will be twenty trustees. The trustees in their collective capacity are known as the Fund. Trust Agreement ¶ 23. One half, or ten, of the trustees are appointed by the Union and the other half are appointed by the Employers. In order to have a quorum at any meeting of the trustees, a majority of the Union trustees *and* a majority of the Employer trustees must be present. Trust Agreement ¶ 10A. Thus a quorum requires the presence of at least six Union trustees and six Employer trustees. Decisions of the trustees require the concurring vote of a majority of the Union trustees *and* a majority of the Employer trustees. Trust Agree-

---

by the Reorganized Debtor and the Fund (Case Document No. 1654) and the documents attached to it.

**2.** The withdrawal liability at issue relates to the Social Insurance Fund, one of the two funds making up the Fund. The Social Insurance Fund provides for health and life benefits. See Finding 7 *infra.*

**3.** The Trust Agreement provides that the Social Insurance Fund is to be used as follows:

"To pay or provide for the payments of premiums on policies of group life insurance group accident and health insurance and such other forms of group insurance for medical care and hospitalization insuring employees as the

Trustees may determine and to pay or provide for the payment of premiums on policies of group insurance for medical care and hospitalization insuring the families of the employees as the Trustees may determine or to pay the aforesaid benefits to the beneficiaries entitled thereto." Trust Agreement ¶ 5B.

**4.** The Fund also has investment income earned on contributions but the Trust Agreement expressly provides that income, if earned, is incidental only. Trust Agreement ¶ 25. It is also provided that it is not intended for the Fund to produce income other than as may be collateral or incidental to its general operation and to avoid waste. Id. In addition, employees may make contributions for their own benefit under limited circumstances.

ment ¶ 10B. Amendments to the Trustee Agreement itself require the concurrence of all of the Trustees. Trustee Agreement ¶ 20.

9. Prior to June 1, 1989, Paragraph 14 of the Trust Agreement read as follows:

"The Trustees from time to time shall determine the immediate and long term financial requirements of the Trust Funds and on the basis of such determination, establish a policy and method of funding."

10. Effective June 1, 1989, Paragraph 14 was amended to read as follows:

"The Trustees from time to time shall determine the immediate and long term financial requirements of the Trust Funds and on the basis [of] such determination establish a policy and method of funding including, but without limitation, rules for the establishment, determination and collection of withdrawal liability for Employers whose obligation to contribute to the Social Insurance Fund has permanently ceased, in whole or in part or whose operations are no longer covered in whole or in part, by the Social Insurance Fund."

This amendment to the Trust Agreement was accomplished by means of a written resolution signed by all of the Trustees in counterparts.

11. Sometime prior to May 25, 1989 a document was prepared that was entitled "Plan Rules with Respect to Employer Withdrawal Liability" (the "1989 Rules"). The

1989 Rules were considered by the trustees at their May 25, 1989 meeting. A quorum was not present at that meeting as it was attended by only five Union trustees and five Employer trustees. Thus, no resolution at that meeting would have been legally sufficient to cause the adoption of the 1989 Rules. No evidence has been put forward by the Fund demonstrating that the Trustees adopted the 1989 Rules by written resolution as they had the amendment to Paragraph 14 of the Trust Agreement.[5]

12. Notwithstanding the absence of legally sufficient action by the trustees at their May 25, 1989 meeting or otherwise to adopt the 1989 Rules, a memorandum dated June 30, 1989 was sent to Employers enclosing a copy of the 1989 Rules and of the Trust Agreement amendment indicating that withdrawal liability assessments would be made against any Employer withdrawing from the Fund on or after July 1, 1989. The 1989 Rules stated that withdrawal liability was to be calculated on a basis which included the sum of three different types of underfunded liabilities: active employee health benefit, active employee life benefit, and retiree life and health benefit. The 1989 Rules provided no details on how the underfunding was to be calculated other than to state that the total of these three underfunded items was to be "as certified by the Fund's actuary to the Trustees".

---

5. Subsequent to the submission of the Statement of Undisputed Facts, the Fund submitted the affidavit of Mark Schwartz, the Chief Counsel to the Amalgamated Life Insurance Company. Schwartz states that he was a member of the Executive Committee appointed by the trustees as permitted by Paragraph 19A of the Trust Agreement and that the 1989 Rules were drafted by a working group of that Committee. Schwartz then takes the position in his affidavit that the Executive Committee had the authority to adopt the 1989 Rules because "pursuant to the authority delegated to them by the Trust, the Trustees of the Fund have always delegated to the Executive Committee the authority to administer the Fund's collection activities including but not limited to the collection of Withdrawal Liability." Schwartz Affidavit at ¶ 5. He states that the 1989 Rules were adopted by the Executive Committee at its March 28, 1989 meeting. However, a plain reading of the minutes of that meeting which are attached to his affidavit reflects the 1989 Rules were *not* adopted by the

Executive Committee. In relevant part the minutes state as follows:

"The Trustees [present at the Executive Committee Meeting] reviewed a proposal to adopt rules to provide for the imposition of Withdrawal Liability for Underfunded Insurance Part Benefits. Upon motion duly made seconded and unanimously carried, it was resolved *to recommend that the Trustees adopt rules imposing such liability*, and to amend the Agreement and Declaration of Trust in accordance therewith." (Emphasis added).

Moreover, the Trust Agreement provides the Executive Committee "shall administer the collection procedures *adopted by the Trustees*". (Emphasis added). Trust Agreement ¶ 11F and 19C(1). Therefore until the trustees acted to adopt any procedures such as the 1989 Rules, the Executive Committee lacked any administrative power. This court therefore disregards the conclusions contained in the Schwartz Affidavit as unsupported by the facts.

13. At the next meeting of the trustees, which was not held until six months later and on November 21, 1989, no quorum was present as only six Union trustees and four Employer trustees were in attendance. The minutes of that meeting state in pertinent part as follows:

"Copies of the minutes of the Trustees meeting held on May 25, 1989 had been circulated prior to the meeting. Upon motion duly made, seconded and unanimously carried, the minutes were approved as submitted and the actions therein ratified and approved."

However since a quorum was not present at this meeting, it was impossible for the 1989 Rules to have been adopted by means of the vote to ratify actions taken at the May 25 meeting.

14. Effective March 1, 1990, Eaglewear and the Union entered into a "Supplemental and Extension Agreement" (the "Gallitzen Wage and Hour Agreement") and a "Supplemental Agreement" (the "Gallitzen Supplemental Agreement") covering certain employees at Eaglewear's Gallitzen operation.

15. Effective March 1, 1990, Eaglewear and the Union entered into a "Supplemental and Extension Agreement" (the "Mahanoy Wage and Hour Agreement") and a "Supplemental Agreement" (the "Mahanoy Supplemental Agreement") covering certain employees at the Eaglewear operation located in Mahanoy City.

16. The provisions of the two Wage and Hour Agreements and the two Supplemental Agreements relevant to the Claim are identical. The Wage and Hour Agreements contained provisions for wage increases, holidays and like subjects and incorporated the prior collective bargaining agreements. They also provided for the rate of contribution to be made to the Fund by Eaglewear. They referred to the Supplemental Agreements and stated that the trustees of the Fund had been authorized and empowered by the Union and each Employer to increase or decrease the Employer contributions during the term of the Agreements as provided in the Supplemental Agreements. *Wage and Hour Agreements ¶ 3B.* The Employer agreed to pay at the contribution rates as increased or decreased. *Id.*

17. The Supplemental Agreements contain terms solely related to the Fund. In the preamble, they state that they are to supersede all prior supplemental agreements.

18. In Paragraph 3(B) of the Supplemental Agreements the parties agreed that the trustees would study and review the Retirement Plan and the Social Insurance Plan. They further agreed that if the trustees should determine, based on a written determination of the Amalgamated Life Insurance Co., Inc., and/or the actuaries servicing the Social Insurance Fund that contribution levels needed to be greater or lesser *to maintain the level of benefits provided by the Social Insurance Fund,* the trustees could fix the amount of the contribution and Eaglewear would pay it. This provision in the Supplemental Agreements is similar to the paragraph in the Wage and Hour Agreements. See Finding 16, *supra.* It also is an explicit acknowledgment by the Employer of the substance of Paragraph IC of the Trust Agreement.[6]

19. Paragraph 3(D) of the Supplemental Agreements provides as follows:

"The Trustees may at any time and from time to time determine that as of an effec-

---

6. Paragraph 1C provides as follows:

"The Trustees shall, from time to time, study and review the Retirement Plan and the Social Insurance Plan. Should the Trustees determine, based on a written determination of the Amalgamated Life Insurance Company, Inc., and/or the actuaries servicing the Fund, that a greater or lesser Employer contribution is required to the Social Insurance Fund to maintain the level of benefits provided by the Social Insurance Fund as of January 1, 1989, the Trustees may fix and determine the amount of such required Employer contribution, and may require each con-

tributing Employer to pay the amount so fixed. Should the Trustees determine, based on a written determination of the actuaries serving the Fund during their Annual Actuarial Review, that a greater or lesser Employer contribution is required to the Retirement Fund to meet the minimum funding requirements of the Retirement Fund, in accordance with the Employee Retirement Income Security Act of 1974, they may fix and determine the amount of such required Employer contribution, and may require each contributing Employer to pay the amount so fixed."

tive date thereafter, the Employer contributions (including investment income) paid or payable to them shall be credited to the Retirement fund and to the Social Insurance Fund, respectively, in such proportions as they determine. Such Employer contributions paid or payable from the effective date of each such determination shall be credited to the Retirement Fund and/or the Social Insurance Fund in accordance with such determination. The parties hereto agree that the Trustees may invoke the procedures provided in the [Trust] Agreement for the collection of sums due should a contributing Employer incur liability for withdrawal from the Plan because of the provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA)."

MPPAA applies only to the Retirement Fund. There is no reference in the Supplemental Agreements to any withdrawal liability with respect to the Social Insurance Fund.

20. Paragraph 6A of the Supplemental Agreements provides that the Supplemental Agreement and the Wage and Hour Agreement and the Trust Agreement "shall be construed as a single document". There is no reference in the Supplement Agreement or the Wage and Hour Agreement to the 1989 Rules or to any withdrawal obligation with respect to the Social Insurance Fund. Nor does the Trust Agreement refer to the 1989 Rules or incorporate them by reference in any way. While Paragraph 14 of the Trust Agreement grants the power to adopt rules, neither that provision or any other provision of the Trust Agreement provide that any rules, once adopted, are incorporated into the Trust Agreement so as to become part of it.

21. After March 1, 1990, Eaglewear never entered into any other collective bargaining agreements or supplemental agreements obligating it to make any contributions to the Social Insurance Fund.

22. The next meeting of the trustees occurred on May 4, 1990. At that meeting of the Fund's trustees a quorum was present, there being six Union trustees and eight Employer trustees in attendance. The minutes of that meeting state in pertinent part as follows:

> "Copies of the minutes of the Trustees meeting held on November 21, 1989 had been circulated prior to the meeting. Upon motion duly made, seconded and unanimously carried, the minutes were approved as submitted and the actions stated therein ratified and approved."

Certainly the trustees could ratify prior actions and the minutes reflect that they had received copies of the November 21, 1989 minutes prior to the May 4, 1990 meeting. What seems more doubtful is whether there was an intention to ratify any actions taken at meetings earlier than November 21, 1989 simply because the minutes of the November 21, 1989 meeting included language ratifying and approving actions taken at the May 25, 1989 meeting. For the purposes of this motion, this court makes the assumption most favorable to the non-moving party that the ratification was intended to include approval of the 1989 Rules.

23. At a meeting which occurred the following year and on May 14, 1991, the Trustees resolved to adopt "Plan Rules With Respect To Employer Withdrawal Liability As Amended As of May 14, 1991" (the "1991 Rules"). According to the 1991 Rules, the sum of the three underfunded portions of the Social Insurance Fund "shall be determined on the basis of methods and assumptions accepted by the Trustees for purposes of the Rules, upon recommendation of the Plan's enrolled actuary".

24. On November 17, 1992, the Trustees rescinded the 1991 Rules effective that date with respect to any Employer that had not withdrawn from the Fund as of that date. No other withdrawal rules have subsequently been adopted.

## DISCUSSION

### SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in F.R.Civ.P. 56 ("Rule 56") as incorporated by Bankruptcy Rule 7056 which is made applicable to contested matters by Bankruptcy Rule 9014. Rule 56 pro-

vides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A fact is material only if it affects the result of the proceeding. A fact is in dispute only when the opposing party submits evidence such that would require a trial to resolve the differences. *In re Tikijian,* 76 B.R. 304, 313 (Bankr.S.D.N.Y.1987); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of fact to be tried, and not to determine any disputed facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996).

■ It has been held that summary judgment is appropriate even when the issue is a contract's proper construction so long as the words of the contract convey a definite and precise meaning absent any ambiguity. *Lazard Freres v. Protective Life Insurance Company,* 108 F.3d 1531 (2d Cir.1997); *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). It is axiomatic that a contract is to be interpreted so as to give effect to the intent of the parties as expressed in the unequivocal language employed. *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) *reh'g denied,* 67 N.Y.2d 647, 499 N.Y.S.2d 1031, 490 N.E.2d 558 (1986); *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978) *reh'g denied,* 46 N.Y.2d 940, 415 N.Y.S.2d 1027, 388 N.E.2d 372 (1979).

It is well settled in New York that the threshold decision on whether a writing is ambiguous is the exclusive province of the court. *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); Patterson, *Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 839 (1964). The writing is unambiguous when, construing as a whole and giving each section its plain meaning, the writing is readily susceptible to only one interpretation. *Dale Carnegie & Associates, Inc. v. Thomas,* 1993 WL 330457, p. 2 (S.D.N.Y.1993); *In re CIS,* 214 B.R. 108 (Bankr.S.D.N.Y.1997). If a writing is clear and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence. *In re Kam Kuo Seafood Corporation,* 76 B.R. 297, 301 (Bankr.S.D.N.Y.1987); *see also Goodheart Clothing Company, Inc. v. Goodman Enterprises, Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (plain meaning should govern the interpretation of the agreement without resort to extrinsic evidence).

■ The primary issues concern the interpretation of the Trust Agreement, the Supplemental Agreements and the Wage and Hour Agreements. Contract interpretation is an issue of law in the first instance and does not raise a factual issue unless the court finds an ambiguity in the contract or from the surrounding circumstances. This court finds no ambiguity nor has either party suggested the need for the court to hear extrinsic evidence. The governing provisions of the Labor Management Relations Law strongly favor staying within the four corners of the written agreements.

■ There are no material facts in dispute which require a trial as to whether the 1989 Rules were adopted by the trustees prior to the trustees' meeting on May 4, 1990. The Fund has produced no written resolution adopting the 1989 Rules at the time of the amendment of Paragraph 14 of the Trust Agreement. The 1989 Rules could not have been adopted at the two trustees' meetings on May 25, 1989 and November 21, 1981 due to the lack of a quorum at those meetings which is evident from the face of minutes. For the reasons explained in Footnote 5, the only other effort made by the Fund to show adoption of the 1989 Rules prior to March 1990 necessarily fails.

*Labor Management Relations Act*

The Reorganized Debtor urges that Eaglewear has no liability for the Claim because there is no writing to which Eaglewear was a party that expressly authorizes the payment. They point to the provisions of the Labor Management Relations Act, specifically 29 U.S.C. §§ 186(a) and (b), which prohibit the making or acceptance of any employer payment to a fund like the Fund unless the payment is expressly authorized by the provisions of 29 U.S.C. § 186(c)(5).[7]

The Reorganized Debtor states that 1989 Rules were not incorporated into the Wage and Hour Agreements or into the Supplemental Agreements, because those agreements were entered into before the effective adoption of the 1989 Rules, which did not occur until the trustees' meeting of May 4, 1990. The Reorganized Debtor further urges that the 1991 Rules cannot apply because they were not even in existence at the time the Wage and Hour Agreements and Supplemental Agreements were entered into in March 1990.

The Reorganized Debtor goes on to urge that, even if there were a written agreement providing for the application of the 1989 Rules or providing the trustees with the right to adopt binding withdrawal rules in the future, payment would still not be authorized because neither the 1989 or 1991 Rules states "the detailed basis on which such payments are to be made ***". The requirement of a "detailed basis" is yet another mandate of 29 U.S.C. § 186(c)(5). In particular, the Reorganized Debtor attacks the method of determination of the underfunded portion of

the Social Insurance Fund on the grounds that the level of discretion accorded to the trustees is so great as violate the requirement for a "detailed basis". See Findings 12 and 23, *supra.* The Reorganized Debtor points out that the obligations of the Social Insurance Fund are quite different from pensions and the underfunding is impossible to calculate without making a number of assumptions that remain unspecified in the Rules.

Finally the Debtors urge that in order for the payments to be authorized under 29 U.S.C. § 186(c)(5), the Trust must be for the sole and exclusive benefit of Eaglewear's employees, and their families and dependents, or of such employees, families, and dependents jointly with the employees of other Employers making similar payments and their families and dependents (the so-called "Sole and Exclusive Benefit Requirement"). The Debtors urge that the Sole and Exclusive Benefit Requirement would be violated if the Fund purports to require the payment of withdrawal liability under either the 1989 or 1991 Rules because Employers who withdrew prior to June 1, 1989 and after November 16, 1992 have not been obligated to make similar payments.

Naturally the Fund disagrees with the Reorganized Debtor. The Fund urges that incorporation by reference is sufficient to satisfy the requirement of a writing under the Labor Management Relations Act. The Fund's position is that the 1989 and 1991 Rules became incorporated into the 1990 contracts between Eaglewear and the Union by virtue of the provision in the Supplemental

---

**7.** The latter section only permits payments as follows:

"with respect to money *** to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, that (A) such payments are held in trust for the purpose of paying *** for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sick-

ness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund *** and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons ***; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities ***"

Agreements that various documents were to be construed as a single document. See Finding No. 20. In the Fund's view, the withdrawal liability its Claim seeks to impose is similar to the withdrawal liability imposed in connection with pension plans.

As set forth in the Findings, the Wage and Hour and Supplemental Agreements were quite specific in referring to the possibility of pension withdrawal liability. It would have been an easy matter of drafting to have referred explicitly to the 1989 Rules in the Wage and Hour and Supplemental Agreements. The absence of such a reference is meaningful under 28 U.S.C. § 186(c)(5). Moreover, this court has already found as a fact that the 1989 Rules had not been lawfully adopted by action of the Fund's trustees at the time the 1990 Wage and Hour and Supplemental Agreements were entered into. While the Trust Agreement as in effect at March 1, 1990 provided for the possibility of the adoption of rules by the trustees to impose withdrawal liability relative to the Social Insurance Fund, the Trust Agreement itself did not impose such a withdrawal liability. Withdrawal liability could only be imposed as a result of further action by the trustees. The Fund has not explained how the 1991 Rules which were not in existence at the time the various agreements were executed in March 1990 could have become incorporated. *Compare Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 485 (11th Cir. 1985) (court held that requirement of § 302(c) was not satisfied by the subsequent amendment of an insurance fund as it could not possibly have been incorporated when the parties drafted their earlier collective bargaining agreement).

Even without the explicit requirement of a written agreement imposed by 29 U.S.C. § 186(c), which was adopted to deal with a variety of improprieties that Congress determined needed to be addressed by statute, the ordinary principles of contract construction would defeat the Fund. The actual words of a contract govern its construction. There is no provision in the various agreements that obligates Eaglewear to make any and all withdrawal liability payments to the Social Insur-

ance Fund based on any withdrawal rules the trustees might adopt in the future.

The Fund has actually litigated the validity of the retroactive application of the 1989 Rules and lost. See *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund*, 967 F.2d 688 (1st Cir.1992). In *Manchester* the First Circuit upheld an injunction issued by the district court which had barred the Fund's application of the 1989 Rules to an employer who had entered into an agreement similar to the Supplemental Agreements sometime in May 1989 prior to the May 25, 1989 amendment of Paragraph 14 of the Trust Agreement.

The Fund seeks to distinguish *Manchester* on several grounds. The first is that the First Circuit was considering the validity of the 1989 Rules against the background of the pre-amendment version of Paragraph 14 of the Trust Agreement. Secondly, the Fund urges that the First Circuit's major focus was on the lack of prior notice to the employer. The Fund's position appears to be that since Eaglewear had notice of the 1989 Rules when it entered into the Wage and Hour Agreements and Supplemental Agreements in 1990 it is bound by the 1989 Rules.

Basically, the Fund comes down to asserting the validity of the 1989 Rules by relying on the fact that the 1989 Rules were circulated to all Employers in late June 1989, *see* Finding 12, and that the Reorganized Debtor never objected to validity of the 1989 Rules until obtaining discovery during this contested matter. Employers were entitled to assume that the Fund had taken the necessary action to properly adopt the 1989 Rules. It was the Trust that was responsible for compliance with the legal formalities required for proper adoption of the 1989 Rules. While nothing in the record on this matter suggests that the Trust actually realized that the 1989 Rules had not been properly adopted in May 1989 when the amendment to the Trust Agreement was adopted, equity cannot supply a remedy for the failure of the Trust to comply with the legal formalities required to adopt the 1989 Rules.

The Fund also ignores the First Circuit's express rejection of the Fund's "single docu-

ment" argument as a means of incorporating the 1989 Rules.

"Even though there is no mention, or any evidence of its contemplation in any of the myriad of agreements, the Fund claims that, construing all the agreements as a single document, it has contractual authority to unilaterally impose withdrawal liability on those participants withdrawing from the Fund after July 1989." 967 F.2d at 694.

The First Circuit went on to reject the very foundations of the Fund's position on the imposition of withdrawal liability with respect to the Social Insurance Fund.

"[T]he Fund makes no answer to [Manchester's] assertion that the purpose of this charge is to fund benefits to employees of employers who had previously withdrawn. It is clearly unreasonable. Indeed, on the Fund's interpretation of the trustee's powers, the trustees could do virtually anything at [Manchester's] expense."

"For example, should the Trustees determine tomorrow that based on 'immediate and long term financial requirements of the Trust Funds' that [Manchester] should liquidate its assets and that in the Trustees' judgment, this was the 'best policy and method of funding,' [Manchester] would be bound by this unilateral decision with no recourse. Likewise, if the Fund decided that 'immediate and long term financial requirements of the Trust Funds' dictated that [Manchester] be forever barred from withdrawing from the Fund, and that that was the best 'policy and method of funding,' then [the Employer] would forever be bound to make contributions to the Fund." 967 F.2d at 694–95.

It is certainly true that Paragraph 14 of the Trust Agreement, as amended, makes explicit reference to the trustees' power to adopt "rules for the establishment, determination and collection of withdrawal liability" as one "policy and method of funding" the immediate and long term financial requirements of the Fund. All of the parade of horribles envisioned by the First Circuit remain possible despite the amendment to Paragraph 14 of the Trust Agreement. If the Fund's construction of the Supplemental Agreements were adopted, that construction would mean that Eaglewear agreed to be bound by any funding method the trustees might adopt in the future including, but without limitation, withdrawal liability rules. Surely, that construction violates the "written agreement" requirement of 29 U.S.C. § 186(c)(5) as well as being an unreasonable interpretation under more general contract principles.[8] A clear illustration of the actual arbitrariness and mischief such an interpretation would permit is the trustees' November 17, 1992 decision to revoke the 1991 Rules but make the revocation application *in futuro* only.

It is hard to have any sympathy for the Fund since the application of withdrawal liability does not appear to afford justice to the Reorganized Debtor nor deal with a well-principled concern of the Fund, particularly in light of its recision of the 1991 Rules in 1992. *Compare Stinson v. Ironworkers District Council,* 869 F.2d 1014 (7th Cir.1989) (At time multi-employee building Trades Welfare Fund experienced rapid reduction in reserves, Fund trustees voted to amend trust to permit withdrawal by an employer but end all benefits to that employer's employees at time of withdrawal. When action was challenged two years later it was held that the Trustees did not act arbitrarily or capriciously in adopting withdrawal amendment).

In light of its holding with respect to the inapplicability of the 1989 Rules, the court finds it unnecessary to consider the other arguments raised by the Reorganized Debtor.

For the foregoing reasons, the motion to expunge the Claim is granted. Settle appropriate order.

---

**8.** As the First Circuit pointed out in *Manchester,* it is hornbook law that a contract is to be construed as meaningful and not illusory. 967 F.2d. at 694. The fundamental inquiry in interpreting a contract is a determination of the intent of the parties at the time of the agreement as expressed in their agreement. *Id.* And a contract should be interpreted in a manner which gives reasonable effect to its terms and conditions. *Id.*