765 F.Supp.2d 375 (2011)
In re MERRILL LYNCH AUCTION RATE SECURITIES LITIGATION.
This Document Relates To: 09 Civ. 5403 (LAP).
Community Trust Bank, Inc., Plaintiff,
v.
Merrill Lynch, Pierce, Fenner & Smith Inc., Defendant.
No. 09 MD 2030 (LAP).
United States District Court, S.D. New York.
January 24, 2011.

*378 MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief Judge.
Plaintiff Community Trust Bank ("CT") filed suit for alleged violations of the federal securities laws and of a variety of Kentucky state laws by Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPFS"). All of the claims arise out of CT's purchase of auction rate securities ("ARS") in a private placement offered by MLPFS. The Defendant's motion to dismiss the Second Amended Complaint ("SAC") is now before this Court. The motion to dismiss is GRANTED.

I. BACKGROUND
In considering this motion, the Court takes the factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir.2008).

A. The Parties

CT is a Kentucky corporation principally based in Pikeville, Kentucky, with operations throughout eastern Kentucky. (SAC ¶ 1.) Defendant MLPFS is a Delaware corporation with its principal place of business in New York and is registered with the SEC as a broker-dealer. (Id. ¶ 4.)

B. Auction Rate Securities

ARS are municipal or corporate debt or preferred securities with long-term maturities (or no maturity in the case of preferred stock) but which have variable interest rates set by periodic auctions. (Id. ¶ 12.) Generally, ARS are traded at "Dutch" auctions held every 7, 28, or 35 days with interest paid at the end of each auction period. (Id. ¶¶ 16-17.) Following an auction, each bid is ranked by an auction agent from the lowest to the highest interest rate bid. (See id. ¶ 17.) The bids are filled beginning with the lowest interest rate, followed by orders with progressively higher interest rates, until all instruments available for sale are matched up with purchase orders. (See id.) The interest rate at which the final ARS available at the auction are sold becomes the "clearing rate." (See id. ¶ 18.) Interest rates for the entire ARS issuance up for auction are then set to the clearing rate. (See id.) If, at a particular auction, there were not enough orders to purchase all of the ARS offered for sale, the auction fails. (Id.) In the event of an auction failure, ARS holders are unable to sell the securities that they hold, and interest rates on the securities are set to a failure rate. (Id.) By February 2008, the ARS market had grown to approximately $330 billion in outstanding securities. (Id. ¶ 13.)

*379 C. The Private Placement

CT purchased $10,050,000 worth of ARS from MLPFS in January 2006. (Id. ¶ 24.) CT purchased these ARS through a $106 million private placement offered by MLPFS involving noncumulative preferred stock in the Federal National Mortgage Association ("Fannie Mae"). (Id. ¶¶ 24-25.)

D. Merrill Lynch's Role in the Auctions

In essence, CT makes two distinct but related allegations regarding MLPFS's role in the auctions: (1) that MLPFS did not disclose its bidding practices (namely the placement of support bids[1] in auctions that would have otherwise failed) and (2) that: as a result of this bidding, the ARS market was not as liquid as MLPFS represented. (See id. ¶¶ 19-20, 25-27, 31-33, 54-56.) MLPFS's support bids allegedly "hid the true infirmities of the auction rate securities market and the illiquidity of such securities." (Id. ¶ 19.) These practices allegedly "enabled [MLPFS] to market its [ARS] securities" to CT. (Id. ¶ 20.)

E. Collapse of the ARS Market

From January 2006 until February 2008, the auctions functioned as MLPFS had predicted. (See id. ¶¶ 24-27.) However, on February 13, 2008, following a wave of auction failures, the ARS market collapsed. (Id. ¶ 27.) On or around this date, MLPFS and other broker-dealers stopped supporting auctions with support bids. (See id.; see also id. ¶ 19.) As a result of the auction failures, CT has been unable to sell $9.9 million of its ARS. (See id. ¶¶ 3, 24.)

F. Procedural Background

CT filed this suit in the Eastern District of Kentucky on December 31, 2009. See Cmty. Trust Bank, Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. 08 Civ. 231 (E.D.Ky. Dec. 31, 2009) (complaint). CT filed its First Amended Complaint on February 23, 2009. On June 10, 2009, 626 F.Supp.2d 1331 (Jud.Pan.Mult.Lit.2009), the Judicial Panel on Multidistrict Litigation transferred this action here for inclusion in coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. CT filed its Second Amended Complaint on October 26, 2009. On November 18, 2009, the Defendant filed this motion to dismiss for failure to state a claim. See Fed. R.Civ.P. 12(b)(6).

II. LEGAL STANDARD

A. Motion to Dismiss

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 129 S.Ct. at 1949. In securities fraud cases like this one, the complaint also must meet heightened pleading *380 requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.2007).

III. ANALYSIS
Because many of the state law claims contain elements contained within the federal securities law claims, the Court discusses the federal claims first. The Court's federal claims analysis proceeds in three parts: (1) CT's allegations relating to the information received by CT prior to purchasing its ARS; (2) CT's allegations relating to information received after the initial purchase; and (3) CT's pleadings in establishing scienter either prior to or after the initial ARS purchase.
Then, because three state claims include elements mirroring those contained in the federal securities claims, the Court discusses those claims briefly by reference to the federal claims analysis. Next, the Court analyzes CT's breach of fiduciary duty claim. Finally, the Court takes up CT's claim of breach of implied covenant of honesty, good faith, and fair dealing under Kentucky law.

A. Federal Securities Laws (Count One)

To state a misrepresentation claim under Section 10(b) and Rule 10b-5, CT must "allege that the defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the Plaintiffs' reliance was the proximate cause of its injury." ATSI, 493 F.3d at 105. To make out a market manipulation claim,[2] the complaint must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Id. at 101; see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

i. Pre-Purchase Allegations

Obviously, a misrepresentation claim must contain an alleged material misrepresentation or omission. CT must point to a material misstatement or some omission that would "significantly alter[ ] the `total mix' of information made available" about its ARS and/or the ARS market. ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir.2009) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). This is a "fact-specific inquiry." Id. In a case where allegations of market manipulation are rooted in alleged misrepresentations, as here, the need to point to material misrepresentations or omissions to support a manipulation claim is equally pressing. See In re Merrill Lynch ARS Litig., 704 F.Supp.2d 378, *381 390-91 (S.D.N.Y.2010) (citing Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)).
CT's allegations, although they include alleged misstatements, primarily sound in omission. CT alleges that, prior to its purchase of ARS in January 2006, MLPFS did not disclose (1) its bidding practices and the ability of MLPFS to submit support bids or affect the clearing rate, (2) liquidity risks in the ARS market, and (3) various potential conflicts of interest. (See SAC ¶¶ 19-27, 33, 36.) CT claims that MLPFS manipulated the ARS market by engaging in the allegedly undisclosed practices. (See id.) Because there is a dispute about whether CT received, by the time of the initial ARS purchase, a Private Placement Memorandum ("PPM") on which MLPFS relies to rebut CT's claims, infra Part III.A.ii., this section of the Court's opinion considers only the disclosures contained in a pre-investment presentation made to CT and titled "Introduction to Auction Market Securities, 3rd Quarter 2005" (hereinafter "3Q Presentation").[3] (Pl. Mem. Ex. A/B.) This presentation disclosed the basic ARS market features that CT now says were either misrepresented or not disclosed before CT's purchase. It is therefore sufficient to defeat CT's claims under the federal securities laws to the extent that they involve alleged misstatements or omissions occurring prior to CT's purchase. See ECA, 553 F.3d at 197. The Court addresses CT's three separate claims sequentially.
First, CT argues that there is "no reference [in the 3Q Presentation] to Merrill Lynch submitting support bids to shore up ARS auctions." (Pl. Mem. at 7.) This is false. The 3Q Presentation states: "An issuer's Lead dealer, while not obligated to do so and completely at its sole discretion, generally submits a `support bid' into an auction to ensure the auction is successful." (3Q Presentation at 9.) Moreover, the presentation materials went on to state that the lead dealer, the role played by MLPFS here, could "submit a support bid at any [interest] rate and that bid may affect the [clearing] rate set in the auction." (Id.) The 3Q Presentation thus disclosed not only that MLPFS generally submitted support bids but also that MLPFS could submit a bid at any rate, even if it affected the clearing rate. (See id.) MLPFS also disclosed that its choice to support auctions was made entirely in its discretion. (See id.) Because the 3Q Presentation provided sufficient disclosures of MLPFS's support bid practice and its effects, CT's misrepresentation/omission claims relating to MLPFS's bidding practices prior to CT's purchase fail.
Second, CT claims that because of MLPFS's support bidding practices, the liquidity risks in the ARS market were concealed. However, the 3Q Presentation discloses the liquidity risks involved. It points out that "[i]f there are more sellers than buyers in any given auction, that auction will fail [and] ... [i]nvestors are unable to sell securities and must hold the securities until either the next successful auction, the legal final maturity date (if one exists) or the issue is called."[4] (Id. at *382 9; see also id. at 8.) The presentation disclosed that if the auctions failedeither because MLPFS did not submit a bid or if the number of buyers were to dwindle for any reasonthe ARS would be illiquid "until the next successful auction." (Id. at 9; see also id. at 8.) The 3Q Presentation points out that one of the functions of the ARS structure was to provide higher yields (with concomitant higher risks) to investors. "A failed auction will set at a Maximum Rate as described in an issue's offering document.... [This feature] represents an attempt to more closely align interests of issuers and investors.... [I]nvestors receive higher yield for reduced liquidity and increased credit risk...." (Id. at 9.) The 3Q Presentation warns that "[i]f an investor attempts to sell a security whose auction has failed, it is expected that the secondary market price would be below par." (Id.)
Relatedly, CT asserts that it believed ARS had "cash-like" liquidity. (SAC ¶ 25 ("Merrill Lynch knew but failed to disclose that the [ARS] were not cash alternatives."); see id. ¶¶ 22, 32, 40, 59.) Again, the disclosures in 3Q Presentation undercut this claim. They explained that "in return for giving up daily liquidity investors demand higher yields."[5] (3Q Presentation at 8 (emphasis added).)
Third, CT alleges that MLPFS omitted its "clear conflict of interest" in the ARS market. (SAC ¶ 33.) However, the potential conflicts of interest between MLPFS and CT were apparent from the 3Q Presentation. The statements that MLPFS (1) could bid, (2) generally did so, (3) could place bids at any interest rate, and (4) such bidding could affect the clearing rate of the entire auction all but spell out the potentially adverse interests. (See 3Q Presentation at 9-10.) For one thing, CT knew that MLPFS acted on behalf of the issuer, Fannie Mae, in the transaction. (See SAC ¶ 24; PPM at 1; 3Q Presentation at 9 ("lead dealers" can place support bids to ensure the issuer's auctions do not fail).) Thus, to the extent that CT claims that a conflict of interest existed because "Merrill Lynch was acting simultaneously on behalf of the issuer, who had an interest in paying the lowest possible interest rate, [and] on behalf of the investor, who was seeking the highest possible return," (SAC ¶ 33), CTa qualified institutional buyerwas aware of this state of affairs. Further, the 3Q Presentation provided that "[d]ealers [like MLPFS] generally maintain a secondary trading market in the securities and may, in their sole discretion, decide to sell auction securities at any time and at any price." (3Q Presentation at 10.) The potential for conflicts of interest not only was apparent from the ARS market structure, but also was disclosed in the 3Q Presentation to CT.
*383 Lastly, Plaintiff sprinkles a number of allegations into the SAC by remarking, without more, that MLPFS failed to disclose that it was
(a) allowing certain customers to place open or market orders in auction; ... (c) asking customers to make or change orders; ... (f) not requiring customers to purchase partially-filled irrevocable orders which provided certain customers with higher returns than the auction clearing rate; and (g) providing inside information about the auction process to certain customers in connection with the auction bidding.
(SAC ¶ 36.) In fact, the presentation materials discussed a number of these issues, including the availability of "Price Talk"[6] and partial order fulfillment.[7] (See 3Q Presentation at 32 ("If there are more buyers than there are securities for sale or securities being rolled at higher minimum levels, bids may be allocated (partially filled), or not filled at all."); id. (indicating that MLPFS engages in Price Talk).)
In short, the SAC does not point to a misrepresentation or omission prior to its purchase of ARS sufficient to allow its federal claims to proceed.[8]See ECA, 553 F.3d at 197; Merrill Lynch ARS, 704 F.Supp.2d at 392. The various statements and omissions that CT identifies were disclosed in the 3Q Presentation prior to its purchase of ARS. And CT is a qualified institutional buyer, which can be expected to appreciate more fully such disclosures and negotiate to protect itself. See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-42 (2d Cir.1997). Thus, CT points to no misrepresentation or omission that would "significantly alter[] the `total mix' of information made available" to CT about the ARS market. See ECA, 553 F.3d at 197.

ii. Post-Purchase Allegations

CT alleges that it continued to purchase ARS in reliance on alleged misrepresentations and omissions from MLPFS and that it still did not know of MLPFS's bidding practices (and consequent liquidity risks and conflicts of interest). (See, e.g., SAC ¶¶ 22, 33-35, 43.) Specifically, the SAC focuses on the period between CT's initial purchase and the market failure in February 2008. it alleges that (1) MLPFS's brokers represented that ARS were liquid and "suitable to the investment goals" of CT, (id. ¶¶ 22, 33); (2) MLPFS continued to "aggressively market and sell auction rate securities to [CT]," (id. ¶ 34 see also id. *384 ¶ 35); and (3) MLPFS issued internal research reports in August and December 2007, which noted that auction failures were rare in the "history of the market" and that MLPFS still believed ARS were still a good investment (id. ¶ 34). CT claims that even in the "last half of 2007[,] Merrill Lynch actively encouraged CT to continue purchasing auction rate securities" (id. ¶ 43) and that it "reasonably relied on these representations each time it purchased these securities." (Id. ¶ 22.) CT argues that it was induced to retain its ARS for over two years until the catastrophic failure of the ARS market.
Putting to one side the question of whether these post-purchase statements were misstatements or omissions, "[t]he general rule is that reasonable reliance must be proved as an element of a securities fraud claim." Harsco Corp. v. Segui, 91 F.3d 337, 343 (2d Cir.1996). "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court considers] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."[9]Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir.2003); see also Lazard, 108 F.3d at 1541-42.
Here, CT's allegations are insufficient to demonstrate that its reliance on MLPFS's brokers and internal MLPFS research reports was reasonable. See, e.g., Harsco Corp., 91 F.3d at 343. Nor does CT allege why the marketing statements are not merely corporate puffery or general statements of optimism, which are not actionable. See Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir.2000). CT merely concludes that the alleged statements were false. Because the PPM adequately discloses the practices that CT claims were not disclosed, its alleged reliance is unreasonable. See Emergent Capital, 343 F.3d at 195; see also Merrill Lynch ARS, 704 F.Supp.2d at 399-402 (reliance on similar alleged misstatements unreasonable in light of MLPFS's disclosures); In re Citigroup ARS Litig., 700 F.Supp.2d 294, 300-01 (S.D.N.Y.2009) (similar).
To explain, in 2006, the SEC settled an investigation into MLPFS's (and other major broker-dealers') ARS practices. (See Selden Decl. Ex. B.) That settlement required MLPFS to disclose its ARS practices, and MLPFS posted a document entitled "Description of Merrill Lynch's *385 Auction Rate Securities Practices and Procedures" (the "August Disclosure") on its website in August 2006.[10] (Selden Decl. Ex. D; SAC ¶ 37.) The Court in this litigation held that the August Disclosure was sufficient to "negate the Plaintiffs' claims" arising after it was posted. Merrill Lynch ARS, 704 F.Supp.2d at 392; see also Citigroup ARS, 700 F.Supp.2d at 306-07 (holding that similar disclosures "disclosed ... the very conduct of which Plaintiff complains"). Here, the disclosures made in the PPM are sufficient to defeat the reasonableness of CT's reliance; the disclosures made in the August Disclosure were almost identical to those made in the PPM. Therefore, CT's reliance upon alleged misrepresentations is unreasonable when confronted with these disclosures.[11]See Emergent Capital, 343 F.3d at 195; see also Merrill Lynch ARS, 704 F.Supp.2d at 399-402.
To begin, MLPFS disclosed that it
routinely places one or more Bids in an Auction for its own account to acquire [ARS] for its inventory, to prevent an Auction Failure Event or an Auction from clearing at a rate that Merrill Lynch believes is higher than the market for similar securities at the time it makes its Bid. Merrill Lynch may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it.
(PPM at 10; see also id. at 10-11 (discussing the same).) This disclosure, and others in the PPM like it, made it clear that MLPFS would, could, and did "routinely" place support bids to insure against auction failure. This disclosure cuts to the essence of CT's claims.
MLPFS also adequately disclosed the liquidity risks in the ARS market. "Because of these [ARS] practices, the fact that an Auction clears successfully does not mean that an investment in the Class A Certificates involves no significant liquidity or credit risk." (Id. at 11.) The PPM warned that auction failure meant that ARS holders "will not be able to sell [their ARS] ... [or] have the liquidity of investment." (Id. at 17.) MLPFS also warned that auction success was not guaranteed and that MLPFS had no obligation to make or maintain a secondary market for ARS. (See id. at 8, 11-12, 17.)
Finally, aside from the inference that MLPFS's proprietary bidding was a conflict of interest, the PPM spelled out potential conflicts of interest: "Merrill Lynch's interests in conducting an auction may differ from those of investors who participate in auctions." (Id. at 11.) The PPM specified that MLPFS's dual roles as an investor and as a market maker meant that it would be privy to the content of the bids prior to making its own bid. (See id. at 10-12.)
In sum, reliance on the post-initial-purchase alleged misstatements was unreasonable after CT received these disclosures. See Merrill Lynch ARS, 704 F.Supp.2d at 399; Citigroup ARS, 700 F.Supp.2d at 307. In light of the extensive *386 disclosures in the PPM, CT cannot now claim that it reasonably relied on allegedly contradictory misstatements from MLPFS brokers or statements of corporate optimism in internal research reports made after the earlier disclosures. Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 109 (2d Cir. 2005) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."); Novak, 216 F.3d at 315.
Likewise, given the extent of these disclosures, CT does not allege any actionable misstatement or omission related to any post-initial-purchase transactions. The disclosures contained in the PPM are, in material respects, parallel to those made in the August Disclosure, and the Court has held that the August Disclosure is sufficient to defeat nondisclosure claims like those made here. See Merrill Lynch ARS, 704 F.Supp.2d at 396.

iii. CT Does Not Adequately Plead Scienter

The Court now turns to scienter, an element in both a misrepresentation/omission and a market manipulation claim. Even if MLPFS failed to disclose material facts or even if CT's reliance thereon was reasonable, CT fails to plead scienter with the required particularity. ATSI, 493 F.3d at 99.
To plead scienter, a complaint must
state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.... The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.
Id. Moreover, "in determining whether the pleaded facts give rise to a `strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324, 127 S.Ct. 2499.
In light of the disclosures made in the 3Q Presentation and later in the PPM and the August Disclosure, CT does not offer sufficient allegations to overcome this hurdle. The Complaint makes only conclusory allegations of "fraudulent" or "intentional" misrepresentations and omissions. (See SAC ¶¶ 53, 59.)
The Complaint makes bare allegations that "[a]uction rate securities were extremely profitable" (id. ¶ 31), and that MLPFS committed the alleged fraud "[i]n order to perpetuate the auction market and to sell as many auction rate securities as possible." (Id. ¶ 32.) CT claims that the "financial incentive[s]" fueled MLPFS's desire to sell auction rate securities. (Id. ¶ 31; see also id. ¶ 20.) However, "[c]ourts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter." Citigroup ARS, 700 F.Supp.2d at 305; see also Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir.2001) (a profit motive, without more, is too generalized to support scienter). CT does not provide specific allegations surrounding MLPFS's "motive and opportunity" to turn a profit sufficient to raise a plausible inference of scienter. ATSI, 493 F.3d at 99.
*387 CT also fails to allege "strong circumstantial evidence of conscious misbehavior or recklessness." Id. As noted above, MLPFS disclosed the very practices that CT now claims were fraudulently and intentionally omitted. CT therefore does not allege a "compelling" inference of scienter on this ground. See Tellabs, 551 U.S. at 324, 127 S.Ct. 2499.

iv. Conclusion

The SAC does not allege that MLPFS made any misrepresentations or omissions to CT (or manipulated the ARS market), that it reasonably relied on alleged misrepresentations or omissions thereafter, or that MLPFS acted with scienter. Given the fact that the SAC could not be amended to overcome these legal obstacles, CT's claims under the federal securities laws are DISMISSED with prejudice.

B. State Law Claims

The Court moves to the claims under Kentucky law. First, the Court discusses Counts Two, Three, and Five (Kentucky securities law, fraud, and negligent misrepresentations and omissions claims, respectively). It then analyzes Count Four, a breach of fiduciary duty claim, and Count Six, a breach of an implied covenant of honesty, good faith, and fair dealing claim.

i. Counts Two, Three, and Five

Counts Two, Three, and Five each include elements of misrepresentations and reasonable or justified reliance. See Ky. Rev.Stat. Ann. § 292.320; Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 916-17 (6th Cir.2007) (Kentucky securities statute is "virtually identical" to the federal securities laws); Flegles, Inc. v. TruServ Corp., 289 S.W.3d 544, 549 (Ky.2009) (plaintiff in a Kentucky fraud action must establish, inter alia, material misrepresentation and reasonable reliance); Presnell Const. Managers, Inc. v. EH Const., LLC, 134 S.W.3d 575, 580-82 (Ky.2004) (action for negligent misrepresentations or omissions requires proof of misrepresentation and "justifiable reliance"). For the reasons stated above in the dismissal of the federal securities claims, CT does not demonstrate that MLPFS made a misrepresentation ex ante, that CT reasonably relied on any post-purchase representations, or that MLPFS acted with scienter. Counts Two, Three, and Five are therefore DISMISSED with prejudice.

ii. Count Four

In Kentucky, "a fiduciary relationship is `founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking.'" Sallee v. Fort Knox Nat'l Bank, 286 F.3d 878, 892-93 (6th Cir.2002) (quoting Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 485 (Ky.1991)). Fiduciary relationships only arise where a party presents evidence that shows "the parties understood and agree that confidence is reposed by one party and trust accepted by the other [and] ... that one party would be acting in the interest of the other." Id. at 893. A fiduciary duty "requires more than the generalized business obligation of good faith and fair dealing." Id. at 891.
CT cites no Kentucky case establishing a fiduciary duty between a broker and its client. The Court of Appeals for the Second Circuit has held that there "is no general fiduciary duty inherent in an ordinary broker/customer relationship." Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir.1998); see also Kwiatkowski v. Bear, Stearns & Co., 306 F.3d 1293, 1302 (2d Cir.2002) ("[A] broker owes no [fiduciary] duty to give ongoing advice to the holder of a nondiscretionary account."). This *388 Court is disinclined to extend such a duty to Kentucky law.
Additionally, CT provides no more than "a formulaic recitation of the elements of a cause of action" for breach of fiduciary duty. Twombly, 550 U.S. at 555, 127 S.Ct. 1955. CT claims it relied on MLPFS's "superior knowledge" and that it "trusted" MLPFS prior to the initial transaction. (SAC ¶¶ 28, 87.) Plaintiff provides only a bare and conclusory allegation that the relationship with MLPFS was "founded on the trust or confidence reposed by CT in the integrity and fidelity of Merrill Lynch's investment recommendations." (Id. ¶ 86; see also id. ¶¶ 28-33.) CT does not allege that MLPFS entered a fiduciary relationship and "that [MLPFS] would be acting in the interest of [CT]." Sallee, 286 F.3d at 893.
Even if CT could establish the existence of a fiduciary duty, it would fail in proving that MLPFS breached such a duty. CT's allegations all point to MLPFS's alleged failure to disclose its ARS practices and the liquidity risks of ARS. (See SAC ¶¶ 28-30, 90-92.) For the reasons stated above in dismissing the federal securities claims, CT has not shown that MLPFS failed to disclose these practices or liquidity risks. For the reasons stated, Count Four is DISMISSED with prejudice.

iii. Count Six

Duties of good faith and fair dealing are implied in every contract in Kentucky. See Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc., 171 S.W.3d 4, 11 (Ky.2005). However, "in the absence of such contract, no duties exist under Kentucky lav." Grisby v. UPS Ground Freight, Inc., No. 2007-CA-002401-MR, 2009 WL 1636293, at *3 (Ky.Ct.App. June 12, 2009). CT alleges it relied on MLPFS's "superior knowledge" and consequently placed its trust and confidence in MLPFS. (See SAC ¶ 108.) CT effectively claims that MLPFS supplied it with false information about ARS and that this act breached the implied covenant of honest, good faith, and fair dealing. (See id. ¶¶ 108-09.)
CT asserts that the "longstanding relationship between CT and Merrill Lynch and the contractual arrangements between them regarding the auction rate securities sold by Merrill Lynch" create the basis for this claim. (Id. ¶ 109.) To the extent the claim is based on the "longstanding relationship," CT does not point to the existence of a contract. See Grisby, 2009 WL 1636293, at *3. With respect to the allegation that the claim is based on the ARS purchase and associated contract, CT does not demonstrate that MLPFS provided false information for the same reasons stated above in Part III.A. Accordingly, Count Six is DISMISSED with prejudice.

IV. CONCLUSION
For the reasons stated above, the Defendants' motion to dismiss [dkt. no. 12][12] is GRANTED in its entirety. Plaintiff's claims are dismissed with prejudice. The Clerk of the Court shall mark this case [No. 09 Civ. 5403] closed, and all pending motions are denied as moot. Pursuant to Rule 7.6 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, the Clerk shall also send a copy of this order to the transferor court, the United States District Court for the Eastern District of Kentucky, and to the Judicial Panel on Multidistrict Litigation. See Patricia D. Howard, A Guide to Multidistrict Litigation, 124 F.R.D. 479, 485-86 (1989).
SO ORDERED.

*389 Appendix APPM/August Disclosure Comparison

-----------------------------------------------------------------------------------------------------------
 PPM (Jan. 24, 2006) August Disclosure (Aug. 2006)
-----------------------------------------------------------------------------------------------------------
 Ability to Intervene in Auctions/Place Support Bids
-----------------------------------------------------------------------------------------------------------
1. "As a Broker-Dealer, Merrill Lynch, 1. "Merrill Lynch acts as principal for its own
Pierce, Fenner & Smith Incorporated ("Merrill account when it places orders for its own
Lynch") is permitted, but not obligated, account in auctions and when it buys and
to submit Orders in Auctions for its own sells for its own account between auctions in
account either as a Bidder or a Seller and the secondary market. However, Merrill
routinely does so in its sole discretion." Lynch is not obligated to place orders for its
(PPM at 10.) own account in auctions, nor is it obligated to
 buy and sell securities for its own account
 between auctions in the secondary market.
 When it does so, it does so in its sole discretion."
 (August Disclosure at 4-5.)
2. "Merrill Lynch routinely places one or 2. "In general, auction procedures permit
more Bids in an Auction for its own account Merrill Lynch to place orders in auctions for
to acquire Class A Certificates for its inventory, its own account." (August Disclosure at 7.)
to prevent an Auction Failure Event or
an Auction from clearing at a rate that Merrill
Lynch believes is higher than the market
for similar securities at the time it makes its
Bid." (PPM at 10.)
3. "Merrill Lynch is not obligated to place 3. "Merrill Lynch is permitted, but not obligated,
such bids or encourage other Bidders to do to submit orders in auctions for its
so in any particular Auction to prevent an own account either as a bidder or a seller, or
Auction from failing or clearing at an off-market both, and routinely does so in its sole discretion."
rate. Investors should not assume (August Disclosure at 15.)
that Merrill Lynch will do so, or that Auction
Failure Events and unfavorable Auction
Rates will not occur." (PPM at 11.)
4. "A Broker-Dealer also may hold Class A 4. "If Merrill Lynch holds any securities for
Certificates for its own account. A Broker-Dealer its own account on an auction date, Merrill
thus may submit Orders to the Auction Lynch will submit a sell order into the auction
Agent as an Existing Holder or a Potential with respect to such securities, which
Holder and therefore participate in an would prevent that auction from being an all
Auction on behalf of both itself and its customers." hold auction. Merrill Lynch may, but is not
(PPM at 17.) obligated to, submit bids for its own account
 in that same auction." (August Disclosure at
 17.)
-----------------------------------------------------------------------------------------------------------
 Ability to Affect Clearing Rates
-----------------------------------------------------------------------------------------------------------
1. "If Merrill Lynch submits an Order for its 1. "[Where MLPFS is the only auction dealer],
own account, it often has an advantage over Merrill Lynch could discern the clearing
other Bidders because Merrill Lynch would rate before the orders are submitted to the
have knowledge of some or all of the other auction agent and set the clearing rate with
Orders placed through Merrill Lynch in that its order." (August Disclosure at 16.)
Auction, and thus could determine the rate
and size of its Order so as to ensure that its
Order is likely to be accepted in the Auction
and the Auction is likely to clear at a particular
race." (PPM at 10.)

*390
2. "[T]he issuer of securities may request 2. "Investors should be aware that bids by
that Merrill Lynch submit an order for its Merrill Lynch or by those it may encourage
own account in the first auction at which [a] to place bids may cause lower clearing rates
new auction period will apply to the auction to occur." (August Disclosure at 17.)
securities. In this context, the rate bid by
Merrill Lynch may effectively place an upper
limit on the rate that can be set at the
auction at a rate that is below the `maximum'
rate." (PPM at 12.)
-----------------------------------------------------------------------------------------------------------
 Liquidity in the ARS Market
-----------------------------------------------------------------------------------------------------------
1. "Because of these practices [MLPFS's 1. "Because of these practices [MLPFS's
ARS practices], the fact that an Auction ARS practices], the fact that an auction
clears successfully does not mean that an clears successfully does not mean that an
investment in the Class A Certificates involves investment in the securities involves no significant
no significant liquidity or credit risk." liquidity or credit risk. . . . Investors
(PPM at 11.) should not assume that Merrill Lynch
 will do so [place support bids to prevent
 auction failures] or that auction failures will
 not occur." (August Disclosure at 16.)
2. "Merrill Lynch provides no assurance as to 2. "Merrill Lynch provides no assurance as to
the outcome of any Auction. Nor does Merrill the outcome of any auction. Nor does Merrill
Lynch provide any assurance that any Lynch provide any assurance that any bid
Bid will be accepted or that the Auction will will be successful, in whole or in part, or that
clear at a rate that a Bidder considers acceptable." any auction will clear at a rate that a bidder
(PPM at 12.) considers acceptable." (August Disclosure at
 18.)
3. "If Sufficient Clearing Bids do not exist in 3. "In any auction of auction rate securities,
an Auction, . . . the Auction Rate for the next holders will be able to sell all of their securities
succeeding Distribution Period will be the for which they submitted a sell order
Maximum Rate and, in such event, Existing only if there are sufficient bids to purchase
Holders that have submitted Sell Orders will all those securities in the auction. If sufficient
not be able to sell in the Auction all, and may bids have not been made, auction failure
not be able to sell any, Class A Certificates results, and holders that have submitted
subject to such Sell Orders. Thus, under sell orders will not be able to sell in the
certain circumstances, Existing Holders may auction all, and may not be able to sell any,
not have the liquidity of investment." (PPM of the securities subject to such submitted
at 17.) sell orders." (August Disclosure at 18.)
4. "Merrill Lynch has no obligation to maintain 4. "However, Merrill Lynch is not obligated
a secondary trading market in auction to make a market in the securities, and may
rate securities outside of auctions. There discontinue trading the securities in the secondary
can be no assurance that a secondary market market without notice for any reason
for these securities will develop or, if it does at any time. Holders who resell between
develop, that it will provide holders the ability auctions may receive less than par value,
to resell auction securities in the secondary depending on market conditions." (August
market on the terms or at the Limes Disclosure at 18)
desired by a holder." (PPM at 12.)
-----------------------------------------------------------------------------------------------------------
 Conflicts of Interest
-----------------------------------------------------------------------------------------------------------
1. "Merrill Lynch receives a remarketing or 1. "Merrill Lynch's interests in conducting an
service fee from the issuer . . . As a result, auction may differ from those of holders and
Merrill Lynch's interests in conducting an prospective holders who participate in auctions."
auction may differ from those of investors (August Disclosure at 16.)
who participate in auctions." (PPM at 11.)
2. "If Merrill Lynch submits an Order for its 2. "You should be aware that, because of the
own account, it often has an advantage over multiple roles that Merrill Lynch plays in the

*391
other Bidders because Merrill Lynch would auction rate securities market, Merrill
have knowledge of some or all of the other Lynch's interests in participating in that
Orders placed through Merrill Lynch in that market may differ from yours." (August
Auction, and thus could determine the rate Disclosure at 4.)
and size of its Order so as to ensure that its
Order is likely to be accepted in the Auction
and the Auction is likely to clear at a particular
rate. For this reason, and because Merrill
Lynch is appointed and paid by the Trust
to serve as a Broker-Dealer in the Auction,
Merrill Lynch's interests in conducting an
Auction may differ from those of Existing
Holders and Potential Holders who participate
in Auctions." (PPM at 10.)
 "[W]henever Merrill Lynch bids in the auctions
 for its own account . . . Merrill Lynch
 may . . . take into consideration such factors
 as the expense involved, the size of Merrill
 Lynch's inventory position, Merrill Lynch's
 capital requirements and Merrill Lynch's
 risk management needs." (August Disclosure
 at 14.)

NOTES
[1] Support bids are bids to ensure that all the ARS for sale in any given auction are purchased; they thus prevent auction failure. (See SAC ¶ 19 (describing support bids as "orders for [MLPFS's] own account" and "proprietary bids ... through which [MLPFS] purchased auction rate securities where there would otherwise be insufficient demand to support an auction").)
[2] To the extent the SAC actually sets out a claim for market manipulation, it is essentially based on the same alleged nondisclosure as the misrepresentation claim, and the Court can decide both claims on the same grounds. Even though the SAC is unclear with respect to the manipulation claim (the federal count does not state "manipulation" or "manipulative," (SAC ¶¶ 52-62)), it appears that CT attempts to make this allegation. (See id. ¶ 19, 23, 26, 33, 36-37, 44-45, 92, 101.) Both the misrepresentation and manipulation claims rise and fall on the same alleged misstatements and/or omissions because the manipulative activity is no more than the implementation of the allegedly undisclosed ARS practices. See, e.g., ATSI, 493 F.3d at 99-100 (disclosed activity does not send a false pricing signal to the market); In re Merrill Lynch ARS Litig., 704 F.Supp.2d 378, 390 (S.D.N.Y. 2010).
[3] Because these marketing materials are referenced in the SAC, the Court considers these materials without converting this motion into one for summary judgment. See Merrill Lynch ARS, 704 F.Supp.2d at 385 n. 4. Moreover, CT acknowledges the receipt of this presentation in its papers and, indeed, provided it to the Court in the Affidavit of Tammy Rushing Provost as Exhibit B.
[4] A "call" of an issue of securities is the exercise of an "option granting the holder the right to buy the underlying asset on (or before) a specified date at a specified (strike) price." Debt Securities: Understanding Fannie Mae Debt: Glossary (Dec. 14, 2010), http://www.fanniemae.com/markets/debt/ understanding_fm_debt/glossary.jhtml. Callable securities are those "whose issuer has the right to redeem the security prior to its stated maturity date at a price established at the time of issuance, on or after a specified date. Fannie Mae debt securities are always redeemed at par." Id.
[5] CT also received a document on March 4, 2005, entitled "FASB 95 Auction Buying Opportunity," which pointed out that a change in accounting principles meant that ARS "can no longer be treated as cash equivalent instruments on a corporate investor's balance sheet." (Pl. Mem. Ex. A/A at 2; see Pl. Mem. at 5.) This disclosure also undermines CT's liquidity claim. Although CT disagrees because the document ultimately suggested that ARS were a good investment (see Pl. Mem. at 5-6), general statements of optimism are not actionable. See Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir.2000); In re Bristol-Myers Squibb Sec. Litig., 312 F.Supp.2d 549, 557 (S.D.N.Y.2004).
[6] "Price Talk" is "the lead dealer ordinarily (but at its sole discretion) publish[ing] its opinion as to the range of rates within which the security is likely to reset in the auction." 3Q Presentation at 32.
[7] If CT is attempting to make some other claim other than in these isolated allegations, it would not survive the heightened pleading standards here. See ATSI, 493 F.3d at 99. For example, some contentions not directly addressed by the 3Q Presentation disclosures, such as "allowing certain customers to place open or market orders in auction [or] ... asking customers to make or change orders" (SAC ¶ 36), are not tied to the liquidity issue which CT claims as the basis of its complaint. (Id. ¶ 24 (CT "has been unable to sell the vast majority of these securities [its ARS]").)
[8] CT argues in its brief that the 3Q Presentation misrepresented the state of the then-pending SEC investigation that resulted in the August Disclosure. (Pl. Br. at 6.) That claim is not contained in the SAC and cannot be added by way of the motion papers. Pollio v. MF Global, Ltd., 608 F.Supp.2d 564, 568 n. 1 (S.D.N.Y.2009). CT also argues that MLPFS misrepresented liquidity issues in stating that, historically, only thirteen issuers have experienced failed auctions. (Id. at 7.) This is not alleged to be false and is nothing more than a non-actionable statement of optimism. See Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).
[9] CT's initial purchase was on January 24, 2006. (Declaration of A. Inge Selden III ("Selden Decl.") Exs. A, B.) Because CT received a Private Placement Memorandum ("PPM") dated that same day, the Court considers the PPM here. (See id.) CT claims it did not receive the PPM until after its initial purchase. (Affidavit of Tammy Rushing Provost ("Provost Aff.") at 4-5; Affidavit of Catherine Lee at 3-4.) But it raises the argument only in its opposition papers. (See Pl. Mem. at 8-9.) "Parties cannot amend their pleadings through issues raised solely in their briefs...." Pollio v. MF Global, Ltd., 608 F.Supp.2d 564, 568 n. 1 (S.D.N.Y.2009). That proposition aside, the PPM was received after the initial purchase. (Pl. Mem. at 9-10; see Provost Aff. at 4-5; Def. Reply Mem. at 5.) On this record, the Court cannot accept MLPFS's contention that CT must have received the PPM at the time of the initial transaction because it is dated that day, but that decision is unnecessary. CT's initial purchase was its "most significant" (Pl. Mem. at 6), and if CT allegedly relied on earlier misstatements or omissions when making later purchases, its claims were "negate[d]" once it received the PPM. See Merrill Lynch ARS, 704 F.Supp.2d at 392; see also Emergent Capital, 343 F.3d at 195 (stating that reasonable reliance precluded when plaintiff could have protected itself). Nevertheless, it is possible that CT purchased some securities before receiving the PPM and after the initial purchase. To the extent this is the case, the Court's analysis supra, Part III.A.i., applies to bar such claims.
[10] Because it is referenced in the SAC at paragraph 37, the Court takes judicial notice of the August Disclosure without having to convert this motion into a motion for summary judgment. See Merrill Lynch ARS, 704 F.Supp.2d at 385 n. 4. It was provided in MLPFS's submissions. The PPM was also provided in the Selden Declaration at Exhibit A, and CT acknowledged in the Provost Affidavit that it received the PPM, albeit after its initial purchase. The SAC also references the private placement form of offering at paragraph 24. The Court thus takes the same approach and considers the PPM without converting the motion.
[11] For a side-by-side comparison of the operative statements in the PPM and the August Disclosure, see Appendix A.
[12] The docket number refers to No. 09 Civ. 5403(LAP).